*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ALEKSANDER STOLAJ; DIELLA STOLAJ,
>                                       *Petitioners,*
>
>                                                              No. 08-3858
>          *v.*
>
> ERIC H. HOLDER, JR., Attorney General,
>                                       *Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A73 624 851; A73 624 852.

Argued: August 4, 2009

Decided and Filed: August 19, 2009

Before: MOORE and ROGERS, Circuit Judges; THAPAR, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Andrea J. Ferrara, LAW OFFICES OF ANDREA J. FERRARA, Eastpointe, Michigan, for Petitioners. James E. Grimes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Andrea J. Ferrara, LAW OFFICES OF ANDREA J. FERRARA, Eastpointe, Michigan, for Petitioners. James E. Grimes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

ROGERS, J., delivered the opinion of the court, in which THAPAR, D. J., joined. MOORE, J. (pp. 14-15), delivered a separate opinion concurring in part and concurring in the judgment.

---

[*] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

—————————————

**OPINION**

—————————————

ROGERS, Circuit Judge.  Aleksander and Diella Stolaj, citizens of Albania, petition for review of the decision of the Board of Immigration Appeals that affirmed the Immigration Judge's removal order.  The IJ found the Stolajs removable due to fraud in their asylum applications and because they had no valid entry documents at the time of their adjustment of status.  Contrary to the Stolajs' arguments, the five-year statute of limitations on rescission proceedings did not bar the Government from initiating removal proceedings based on the Stolajs' fraud.  In addition, the IJ did not err in allowing the Government to initiate removal proceedings without first seeking to revoke the Stolajs' asylee status, and the IJ properly denied the Stolajs' motion to subpoena material witnesses.  Because the decisions of the IJ and the BIA are supported by substantial evidence and are not manifestly contrary to the law, they must be upheld.

I.

Aleksander and Diella Stolaj, husband and wife, are citizens of Albania who entered the United States on February 26, 1996.  On December 18, 1996, they each filed applications for asylum, but on January 23, 1997,  Aleksander Stolaj withdrew his application and requested that he be included on his wife's application.

Asylum Officer Mark Bastian of the New York Asylum Office interviewed Diella Stolaj on the same day that Aleksander withdrew his application, and filed an assessment memo on the following day.  Officer Bastian found that Diella Stolaj "has not shown any past persecution" and that her "fear of future persecution in Albania is not sustained by the Acosta 4 prong test for well foundedness."  Despite this assessment, Diella Stolaj was granted asylum on February 6, 1997, because she had "established a well-founded fear of persecution upon return to [Albania]."  Aleksander Stolaj was granted derivative asylum the same day.  The Stolajs adjusted to lawful permanent resident status on October 1, 1998.

The FBI began investigating allegations that Asylum Officer John Shandorf, Bastian's supervisor, had accepted bribes in exchange for granting asylum applications. On November 17, 1998, the FBI arrested Luigi Berishaj based on information that Berishaj was collecting money from Albanian friends and paying Shandorf to secure political asylum for them. The FBI report[1] states that:

> From in or about mid-1996 until September, 1997 BERISHAJ made cash payments to SHANDORF in connection with approximately twenty cases. Each time BERISHAJ paid SHANDORF between $1,500 and $2,000. In exchange for these payments SHANDORF agreed to provide assistance in securing political asylum for these individuals. In all but three or four of the twenty cases mentioned above the applicants were granted political asylum.

Berishaj indicated that Diella Stolaj was one of the individuals who paid him to obtain political asylum through Shandorf.

Shandorf was indicted for his involvement in this bribery scheme. During Shandorf's trial, Berishaj testified about his involvement in the scheme and his interactions with the Stolajs. Berishaj testified that Aleksander Stolaj approached him for help in obtaining asylum, and Berishaj subsequently spoke with Shandorf about the Stolajs. When Berishaj told Shandorf that the Stolajs lived in Detroit, Shandorf advised Berishaj that the couple should use a Westchester, New York, address on their application. (Shandorf worked out of the New York Asylum Office.) Berishaj filled out the asylum applications for the Stolajs and submitted the forms to the Vermont Service Center. Berishaj accompanied the Stolajs to their interview at the New York Asylum Office. Shandorf told Berishaj to wait with the Stolajs in the cafeteria until Shandorf called the Stolajs into the office. Berishaj testified that Shandorf was in the interview, but could not recall if there was another officer present.

---

[1] This FBI report is part of the administrative record but was not admitted into evidence by the IJ and therefore cannot support the IJ's decision. Much of the same information is contained in Berishaj's testimony from Shandorf's trial and Shandorf's indictment, which were admitted into evidence. The information from the FBI report is used only for background purposes.

On July 9, 2003, the Department of Homeland Security initiated removal proceedings by issuing Notices to Appear to the Stolajs. The Notices to Appear stated that the Stolajs were subject to removal based on the following allegations:

> 8.  You procured your admission, visa, other documentation or benefit by fraud or by willfully misrepresenting a material fact, to wit: You obtained the immigration benefit of asylee status by fraud; a supervisor convicted of granting asylum in exchange for bribes changed your denial to a grant for the sum of $3,000.
> 9.  At the time of your adjustment to permanent resident status you did not then possess or present a valid immigrant visa, reentry permit, order crossing identification card, or other valid entry document, and you were not exempt therefrom.

The Stolajs filed several motions prior to their individual hearings, including a motion to terminate and a motion to subpoena material witnesses.

The IJ conducted a merits hearing on July 7, 2005, at which Aleksander and Diella Stolaj testified. The Stolajs testified that they lived with Diella Stolaj's family in Detroit when they first entered the United States in February 1996. The Stolajs testified that they moved to New York in April 1996 and lived there until April 1997 when they returned to Michigan. A few months prior to filing their asylum application in December 1996, the Stolajs testified that they ran into Berishaj in a restaurant in Michigan.[2] The IJ summarized Aleksander Stolaj's testimony regarding the Stolajs' interactions with Berishaj:

> Male respondent testified that he applied for asylum in December 1996 or January 1997. His wife's sister told him about the availability of political asylum. About a month and a half before submitting the application, he went with his wife and her sister to pick up the application at a travel agency in Hamtramck [Michigan]. After picking up the application, they went to a restaurant to get some food and to wait for female respondent's uncle to come assist them in filling out the forms. Luigji Berishaj came into the restaurant and recognized female respondent from Yugoslavia. They talked, and Berishaj offered to help

_____

[2]The Government attorney questioned Aleksander Stolaj about this encounter with Berishaj in Michigan, which took place during the time Stolaj testified he was living in New York. Though the time line and location of these events is unclear from his testimony, Stolaj testified that he traveled back to Michigan because his wife's sister told him about how to pick up asylum forms in the area.

fill out the asylum applications. Berishaj said nothing about having filled out other asylum applications. Berishaj would ask each question, respondents would reply, and Berishaj would write the statement in English. After completing the form, Berishaj read it back to them. Berishaj offered to mail the applications with an envelope obtained at the travel agency. Male respondent denied giving Berishaj any money in exchange for his help and also stated that no one else gave Berishaj any money on his behalf.

On December 13, 2006, the IJ found that the Stolajs were removable because "[t]he Government has proven through clear and convincing evidence that the respondents were granted asylum through fraud." The IJ summarized the reasons supporting this conclusion:

> The Government has provided a transcript of a criminal proceeding containing the sworn testimony of the individual who respondents admit completed their applications for them stating that respondents received their asylum due to the improper interference of an asylum supervisor, John Shandorf, who was paid for his help. The Government presented the incredible testimony of the respondents on the circumstances concerning their encounter with Berishaj. Finally, the Government showed that the claimed New York residence was a misrepresentation provided to ensure that the respondents would be able to benefit from Berishaj's relationship with John Shandorf.

The IJ also found that the Stolajs were removable "because there was no valid basis for their adjustment of status. As the Government has shown that the asylum and following adjustment were obtained by fraud, and as respondents admitted originally overstaying their visas, the Government has proven the respondents have no valid documents."

On January 12, 2007, the Stolajs appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The Stolajs argued that: (1) the Government's removal action was barred by the five-year statute of limitations on rescission proceedings in 8 U.S.C. § 1256(a); (2) the IJ improperly allowed the Government to initiate removal proceedings without first revoking the Stolajs' asylee status; (3) the record did not support a finding that the Stolajs engaged in fraud in their asylum application; (4) the IJ applied the wrong standard in revoking the Stolajs' permanent resident status; (5) the IJ

abused his discretion in denying the Stolajs' motion to subpoena material witnesses; and (6) the IJ erred in finding the Stolajs not credible.

On June 26, 2008, the BIA adopted and affirmed the IJ's decision and dismissed the Stolajs' appeal.  The BIA found that the Stolajs' status as lawful permanent residents or asylees did not immunize them from removal proceedings, citing *Matter of Smriko*, 23 I. & N. Dec. 836 (BIA 2005).  The BIA also found "no adequate basis to disturb the Immigration Judge's finding that the respondents obtained their asylee status through fraud, based on the properly admitted transcript of the testimony of Luigi Berishaj . . . ." "Thus, the DHS satisfied its burden of proving by clear and convincing evidence that the respondents were removable."  Finally, the BIA found that the IJ properly denied the Stolajs' motion to subpoena material witnesses and that there was no evidence that the IJ "discarded his role as a neutral arbiter."

The Stolajs filed a timely petition for review in this court on July 10, 2008.  On appeal, the Stolajs raise the same arguments they raised before the BIA.

II.

The Government was not time-barred from initiating removal proceedings against the Stolajs.  The five-year statute of limitations on rescission proceedings found in 8 U.S.C. § 1256(a) does not apply to the removal proceedings brought against the Stolajs.

At the time the Government initiated removal proceedings, the Stolajs had successfully adjusted their statuses to permanent lawful residents.  The Stolajs argue that the Government was barred from "placing Petitioners in Rescission proceedings more than 5 years after their status was adjusted to that of permanent resident status."  The Stolajs base this argument on the statute defining the power of rescission of lawful permanent resident status:

> If, at any time within five years after the status of a person has been otherwise adjusted under the provisions of section 1255 or 1259 of this title or any other provision of law to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney

General that the person was not in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling removal in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made. Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 1229a of this title, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.

8 U.S.C. § 1256(a). The Stolajs assert that the Government attempted to circumvent the statute of limitations on rescission proceedings by initiating removal proceedings instead. The Stolajs argue that, under these circumstances, § 1256(a)'s five-year statute of limitations also applies to removal proceedings.

The Stolajs recognize that the Attorney General and several circuits have rejected the argument that the five-year statute of limitations on rescission proceedings in § 1256(a) applies to removal proceedings. *See Matter of Belenzo*, 17 I. & N. Dec. 374 (A.G. 1981); *Asika v. Ashcroft*, 362 F.3d 264 (4th Cir. 2004); *Kim v. Holder*, 560 F.3d 833, 836-38 (8th Cir. 2009); *Monet v. INS*, 791 F.2d 752, 754 (9th Cir. 1986); *Oloteo v. INS*, 643 F.2d 679, 681-83 (9th Cir. 1981). However, the Stolajs urge this panel to follow the contrary conclusion of the Third Circuit in *Bamidele v. INS*, 99 F.3d 557 (3d Cir. 1996) (later reaffirmed in *Garcia v. Attorney General*, 553 F.3d 724 (3d Cir. 2009)), and hold that § 1256(a)'s statute of limitations applies to removal proceedings. We decline to do so.

By its own terms, § 1256 places a time bar only on the Government's attempt to rescind the status of a lawful permanent resident, and does not apply to removal proceedings. In an attempt to clarify the separate nature of removal and rescission proceedings, Congress amended § 1256(a) in 1997 by adding the final sentence. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, Div. C., Title III, § 378(a), 110 Stat. 3009. This amendment explicitly allows the Government to initiate removal proceedings, such as those brought against the Stolajs, without first rescinding the alien's permanent resident status.

To the extent that there might be ambiguity in the application of § 1256(a)'s statute of limitations to removal proceedings based on charges that would also support rescission of status, we defer to the Attorney General's interpretation because it is "based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863 (1984); *see also Asika*, 362 F.3d at 269; *Kim*, 560 F.3d at 837-38.  The Attorney General first resolved any ambiguities in § 1256(a) in a 1962 opinion:  "I conclude that since [8 U.S.C. § 1256] only limits the Attorney General's authority to rescind an adjustment of status, the lapse of more than five years since applicant's adjustment does not bar an exclusion proceeding based upon the alleged fraudulent procurement of an entry visa prior to his adjustment of status." *Matter of S—*, 9 I. & N. Dec. 548, 557 (A.G. 1962).

In *Bamidele*, the Third Circuit rejected the Attorney General's construction because, the court reasoned, that construction would essentially read the statute of limitations on rescissions out of existence—that is, the Government could always do something through removal that it could not do otherwise through rescission.  *See Bamidele*, 99 F.3d at 564.  However, the Third Circuit did not sufficiently credit the important role played by the statute of limitations on rescissions even though it does not apply to removal proceedings.  As the Fourth Circuit explained, the five-year statute of limitations on rescission of status has a meaningful role because the INA provides far fewer procedural protections for rescission proceedings than for removal proceedings:

> Under the Act, rescission proceedings are subject to few, if any, procedural protections, *see* 8 U.S.C. § 1256; deportation proceedings, in contrast, are subject to extensive procedural regulations set forth in 8 U.S.C. § 1229a. In light of this difference in the two procedures, section 246(a)'s five-year limitation on rescission—even if interpreted to apply only to rescission proceedings—provides an important safeguard to aliens like Asika, who have been in the country for more than five years after their status has been erroneously adjusted, by forcing the Attorney General to establish their deportability through the more rigorous procedures of removal, *see* 8 U.S.C. § 1229a, rather than the less procedurally-onerous process of rescission.

*Asika*, 362 F.3d at 269; *see also Belenzo*, 17 I. & N. Dec. at 382-83; *Matter of S—*, 9 I. & N. Dec. at 555 n.8.  The Attorney General reasonably concluded that § 1256(a)'s statute of limitations only applies to rescission proceedings.

By its own terms, § 1256(a)'s statute of limitations only applies to rescission proceedings.  Even if the provision is ambiguous when charges supporting removal would also support rescission of status, the Attorney General's opinion that § 1256(a) does not apply to removal is reasonable and is entitled to deference.  Therefore, the Government was not time-barred from bringing removal proceedings against the Stolajs.

## III.

The Stolajs argue that the IJ and the BIA erred in allowing the Government to initiate removal proceedings without first following the requirements for revoking the Stolajs' asylee status.  This argument is without merit.  The BIA correctly found that the Stolajs are not immune from removal simply because their asylee status was never revoked.

The IJ determined that "as legal permanent residents, the asylum revocation procedures are irrelevant to the respondents."  The BIA affirmed the IJ's decision on this point but clarified the supporting reasons.  The BIA noted that in *Matter of Smriko*, 23 I. & N. Dec. 836 (BIA 2005), "we determined that a refugee who had adjusted his status to lawful permanent resident and later was convicted of crimes was not immune from removal because his refugee status had not been terminated."  In *Smriko*, the BIA did not focus on whether a refugee loses his status as a refugee when he becomes a legal permanent resident, as is implied by the IJ's decision.  Rather, the BIA held that refugee status does not confer immunity from removal, and therefore revocation of refugee status is not required before the initiation of removal proceedings.  *Id.* at 838-40.  "Although some vestiges of refugee status are afforded by regulation to refugees who have been admitted as lawful permanent residents, termination of refugee status is not a precondition to the initiation of removal proceedings against refugees who have adjusted their status."  *Id.* at 837; *see also Kaganovich v. Gonzales*, 470 F.3d 894, 897 (9th Cir. 2006); *Romanishyn v. Attorney General*, 455 F.3d 175, 183-84 (3d Cir. 2006).

IV.

The BIA correctly found that the Stolajs were removable because "they had obtained the immigration benefit of asylum by fraud," and "since their asylee status was fraudulently procured, [they] were inadmissible as immigrants with no valid visa or entry document." *See* 8 U.S.C. § 1182(a)(6)(C)(i), (a)(7)(A)(i)(I). The Stolajs argue that the record did not support these findings. Because the BIA adopted and supplemented the IJ's decision, we review both decisions. Because the Stolajs are previously admitted aliens, the Government bears the burden of establishing removability by "clear and convincing evidence." 8 U.S.C. § 1229a(c)(3)(A). To reverse the IJ and the BIA's determination that the Government met this burden, this panel must find that the evidence "not only supports a contrary conclusion, but indeed compels it." *Yu v. Ashcroft*, 364 F.3d 700, 702-03 (6th Cir. 2004) (internal quotation marks omitted); *see also* 8 U.S.C. § 1252(b)(4)(B). Because the evidence does not compel a conclusion contrary to the decisions of the IJ and the BIA, and because the decisions are not "manifestly contrary to law," 8 U.S.C. § 1252(b)(4)(C), we uphold the decisions of the IJ and the BIA.

The decisions of the IJ and the BIA were properly supported by the testimony given by Berishaj during Shandorf's trial. Berishaj's testimony clearly implicated the Stolajs in a fraudulent scheme to obtain asylum. The IJ found that "[w]hile the evidence may be insufficient to show the respondents bribed the asylum officer, the Government need only show fraud or willful misrepresentation, not bribery. Thus, the Government's failure to prove a *quid pro quo* arrangement is not determinative of whether it has proven its case." The IJ correctly stated the standard from 8 U.S.C. § 1182(a)(6)(C)(i):

> Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

The IJ's conclusion that Berishaj's testimony supports finding the Stolajs removable under this provision is not manifestly contrary to law.

In addition, the IJ properly found that "the Government also established respondents' fraud through respondents' own testimony." The IJ based this conclusion on the following findings:

- "The[ Stolajs'] explanation of how Berishaj conveniently appeared and, in an encounter devoid of any catching up or small talk, filled out respondents' applications, and disappeared is simply unbelievable."
- "The inconsistencies between respondents' and Mrs. Gjonaj's [Diella Stolaj's sister] testimony regarding Mr. Berishaj's prior experience with applications and the discussion involving payment further detract from the credibility of testimony."
- There were multiple inconsistencies in the Stolajs' descriptions of where they lived in New York. In addition, Aleksander Stolaj said that he had never heard of Yonkers, and then later remembered that that was where he lived in New York. He also stated that he took the train to work, but described the train as above ground.
- Diella's sister testified that the Stolajs were living in Detroit at the time the asylum applications were filled out and at the time of the asylum interview. She later corrected herself and said that the Stolajs were traveling back and forth between New York and Detroit because her, and Diella's, father was ill, but later testified that their father died in 1978.
- Aleksander Stolaj's withdrawal of his asylum application on the day of Diella's interview appears to indicate that he knew what the outcome was going to be.
- The Government submitted the Stolajs' fingerprint cards taken on August 8, 1996, in Detroit. "The cards contain a Hamtramck, Michigan address that had been whited-out and replaced with the Yonkers, New York address. . . . While there are a number of legitimate reasons for an address change on a fingerprint card, there is no explanation as to why the address was changed from an address at which respondents supposedly did not reside until April or May of 1997, at least nine months after the fingerprint card was dated and at least two months after they were granted asylum."
- The findings in Officer Bastian's assessment memo indicate that Diella Stolaj's application for asylum was not actually granted on the merits.
- There were multiple inconsistencies in Diella Stolaj's asylum claims.

The BIA cited many of the same grounds in its decision.  The BIA properly found "no adequate bases to disturb the Immigration Judge's finding that the respondents obtained their asylee status through fraud."

The decisions of the IJ and the BIA are supported by the documentary evidence, the transcript of Berishaj's trial testimony, and the inconsistencies in the Stolajs' testimony.[3]  The IJ and the BIA did not err in finding the Stolajs removable based on their fraud in obtaining asylum.

V.

The IJ properly denied the Stolajs' motion to subpoena material witnesses based on the Stolajs' failure to comply with agency procedures for obtaining a subpoena.  The Stolajs argue that the IJ abused his discretion in denying their motion and that their Fifth Amendment due process rights and Sixth Amendment confrontation rights were violated.  These arguments are unavailing.

The BIA correctly found that the IJ properly denied the subpoena motion because the Stolajs failed to comply with the requirements for obtaining a subpoena from an IJ.  The INA states that an "immigration judge *may* issue subpoenas for the attendance of witnesses and presentation of evidence."  8 U.S.C. § 1229a(b)(1) (emphasis added).  Immigration regulations state:

> A party applying for a subpoena shall be required, as a condition precedent to its issuance, to state in writing or at the proceeding, what he or she expects to prove by such witnesses or documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same.

8 C.F.R. § 1003.35(b)(2).  The IJ denied the Stolajs' motion because they failed to comply with the requirements of this provision.  While the Stolajs' motion appears to

---

[3]The Stolajs also argue that the IJ "mischaracterized the record of proceeding and erred in finding that petitioners were not credible."  To the extent that the Stolajs attack the IJ's conclusions based on the evidence, the decision was not manifestly contrary to law.  To the extent that the Stolajs attack the IJ's factual determinations, the Stolajs do not make any arguments that show how the IJ clearly erred.

make some attempt to show what they expected to prove with some of the witnesses,[4] the motion does not show that they had "made a diligent effort, without success, to produce the same." The IJ properly exercised his discretion and denied the subpoena motion.

The Stolajs' constitutional claims are without merit. The Stolajs do not explain how the IJ's rejection of their motion based on failure to comply with the requirements of 8 C.F.R. § 1003.35(b)(2) violated their Fifth Amendment due process rights. In addition, the Stolajs' brief argument based on the Confrontation Clause, citing *Crawford v. Washington*, 541 U.S. 36 (2004), is inapposite because the Sixth Amendment does not apply to the Stolajs' removal proceedings, *see Mustata v. United States Dept. of Justice*, 179 F.3d 1017, 1022 n.6 (6th Cir. 1999).

VI.

For the foregoing reasons, we deny the Stolajs' petition for review.

---

[4] The Stolajs sought to subpoena the testimony of Shandorf, Bastian, Berishaj, Vladimir Smalaj (interpreter at the asylum hearing), and "FBI agents who authored reports regarding Stolaj."

---

### CONCURRING IN PART AND CONCURRING IN THE JUDGMENT

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment. I write separately because I believe it is unnecessary to weigh in on the circuit split concerning the applicability of the five-year statute of limitations in 8 U.S.C. § 1256(a) to certain removal proceedings. The circuit split involves the narrow question of whether § 1256(a)'s five-year statute of limitations on rescission proceedings (i.e., proceedings to rescind an alien's permanent residency status) applies to removal proceedings that are based solely on fraud or error in the procurement of permanent-residency status. Three circuits have deferred to the Attorney General's opinions in *Matter of S-*, 9 I. & N. Dec. 548, 557 (A.G. 1962), and *Matter of Belenzo*, 17 I. & N. Dec. 374, 384 (A.G. 1981), and have held that § 1256(a)'s five-year statute of limitations does *not* apply to removal proceedings even when removal is based solely on violations or errors in the adjustment-of-status process. *See Kim v. Holder*, 560 F.3d 833, 837-38 (8th Cir. 2009); *Asika v. Ashcroft*, 362 F.3d 264, 269-71 (4th Cir. 2004); *Monet v. INS*, 791 F.2d 752, 754 (9th Cir. 1986). However, the Third Circuit has rejected the Attorney General's construction of § 1256(a) and has held that the five-year statute of limitations applies to removal proceedings when the removal proceedings are based solely on an attack on the adjustment process. *Bamidele v. INS*, 99 F.3d 557, 564-65 (3d Cir. 1996).

In my view, we need not weigh in on this circuit split because the disagreement in these cases centers on an issue that is absent from the instant case. Each of the cases cited above involved aliens whose removability was based solely on fraud or error in the adjustment process. *See Kim*, 560 F.3d at 835 (fraud in obtaining green card/adjusting status); *Asika*, 362 F.3d at 266 (erroneous adjustment by INS); *Monet*, 791 F.2d at 753 (concealment of prior conviction when seeking adjustment); *Bamidele*, 99 F.3d at 558 (fraud in adjusting status through sham marriage). By contrast, the Stolajs' removal was not based on fraud or error in the adjustment process, but rather on their fraud in obtaining asylum. There is no dispute in the case law that when, as here, removal

proceedings are based on grounds entirely separate and distinct from the adjustment-of-status process, § 1256(a)'s five-year statute of limitations does not apply.  It is therefore unnecessary and imprudent for us to reach the narrower—and more difficult—question that has split the circuits.  *See Arellano-Garcia v. Gonzales*, 429 F.3d 1183, 1186 (8th Cir. 2005) (concluding that § 1256(a)'s statute of limitations was inapplicable and declining to comment on *Bamidele*, *Asika*, and *Belenzo* because the removal proceedings were based on the alien's "prior conviction, not on the erroneous grant of permanent residency status").  Accordingly, I concur in the result of Part II without joining its reasoning.  On the remaining issues, I concur and join in the majority opinion.