[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15334

_____

Agency No. A073-440-757

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2011
JOHN LEY
CLERK

MARIA GLADYS ALHUAY,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(October 26, 2011)

Before HULL and ANDERSON, Circuit Judges, and VINSON,* District Judge.

_____

*Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

PER CURIAM:

Maria Gladys Alhuay petitions for review of the Board of Immigration Appeals' ("BIA") order affirming (1) the Immigration Judge's ("IJ") decision that she was removable, and (2) the IJ's denials of Alhuay's applications for a waiver of removability and cancellation of removal. After oral argument and review of the record, we deny Alhuay's petition in part and dismiss it in part.

## I. BACKGROUND

### A. Marital and Immigration History

Before discussing Alhuay's testimony at her multiple hearings, we review the facts revealed in certain documents and declarations.

Alhuay is a Peruvian citizen. In 1975, Alhuay married Carlos Saldana in Peru. In 1990, Alhuay entered the United States without documentation or inspection.

In 1992, while still married to Saldana, Alhuay married José Diaz in the United States. In February 1993, Alhuay and Diaz were divorced.

In April 1993, Alhuay married Abel Quesnay, a lawful permanent resident, in Nevada. In her 1993 application for a marriage license to Quesnay, Alhuay stated that this was her second marriage and that her first marriage ended in

2

divorce in February 1993.[1]  During their marriage, Quesnay and Alhuay had one son together, Jesse Quesnay.

In April and May 1993, Quesnay prepared and filed a Petition for Alien Relative on Alhuay's behalf.  In April 1993, Alhuay signed a "Biographic Information" form, which was filed in connection with her 1993 Petition for Alien Relative.  That form had a blank space to fill in the names of "FORMER HUSBANDS AND WIVES."  The statement "NEVER MARRIED BEFORE" was written in that blank.

In October 1995, Alhuay filed for special immigrant status as a self-petitioning spouse of an abusive citizen or lawful permanent resident (Quesnay).  Her self-petition was approved in August 1996.  In February 1997, Alhuay and Quesnay were divorced, and the Superior Court of King County, Washington, issued a restraining order against Quesnay as a result of domestic violence against Alhuay.

In May 1997, Alhuay again married Quesnay in Nevada.  In her second, 1997 application for a license to marry Quesnay, Alhuay stated that this was her

---

[1] Presumably, this is a reference to Alhuay's marriage to Diaz, whom she divorced in February 1993.

second marriage and that her first marriage ended in divorce in February 1997.[2]

In October 1997, Alhuay applied to adjust her status to lawful permanent resident based on her approved self-petition. The application to adjust her status asked about prior arrests. Alhuay listed one arrest for driving under the influence and one for a domestic-violence incident. In support of her application to adjust her status, Alhuay signed and submitted a "Biographic Information" form dated October 22, 1997. The form lists Quesnay, Diaz, and Saldana as former husbands.

In December 1997, Alhuay's application to adjust her status to lawful permanent resident was approved based on her being the battered "spouse" of Abel Quesnay, a lawful permanent resident. In March 2000, Alhuay and Quesnay were divorced again, and Alhuay obtained another restraining order against Quesnay.

In 2005, Alhuay obtained a final Peruvian decree of divorce from Saldana, based on proceedings begun in 2003.[3] In 2005, Alhuay applied for naturalization.

---

[2] Presumably, this is a reference to Alhuay's marriage to Quesnay, whom she divorced in February 1997.

[3] The record below contains a declaration, dated July 1996, which Alhuay claims was filed in support of her self-petition. In the 1996 declaration, Alhuay stated that she was divorced from Saldana in 1978, she could not locate a copy of the divorce decree, a flood in Peru had destroyed the records years earlier, and her daughter in Peru was trying to obtain a copy of the decree. The 1996 declaration does not bear a stamp or notation indicating that it was received by any government agency. Further, the evidence shows that Alhuay was not divorced from Saldana until 2005.

4

In 2006, Alhuay married Luis Condori. Alhuay remains married to Condori.

## B. 2007 Notice to Appear

On January 31, 2007, Alhuay was served with a Notice to Appear ("NTA"). The NTA alleged that: (1) Alhuay's status was adjusted on December 15, 1997, (2) Alhuay sought to obtain a benefit under the INA by fraud or willful misrepresentation of a material fact when she "filed as the battered spouse" of Quesnay and concealed the fact that she was still married to Saldana, which made her ineligible for adjustment of status as a battered spouse, and (3) at the time of her application for adjustment of status, Alhuay intended to remain permanently in the United States and did not possess valid entry or identity documents.

Based on these allegations, the NTA charged that Alhuay was removable under INA § 237(a)(1)(A), 8 U.S.C. § 1227(a)(1)(A), as an inadmissible alien: (1) under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), due to her fraud or willful misrepresentation in her adjustment-of-status application; and (2) under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), because she did not possess a valid visa or other entry document.

## C. May 2007 Hearing

Alhuay responded to the allegations in the NTA at her first hearing before the IJ on May 30, 2007. At that hearing, Alhuay was represented by James

5

McTyier, who did not request an interpreter. Alhuay admitted that she was a native and citizen of Peru and that her status was adjusted to lawful permanent resident on December 15, 1997, as alleged in the NTA. She denied the other charges and allegations. The hearing was continued to give the government time to prepare documentary evidence.

**D. June 2008 Hearing**

A subsequent removal hearing was held on June 26, 2008. At that hearing, Alhuay's lawyer, James McTyier, requested an interpreter. The IJ responded that an interpreter was not immediately available, but he would try to locate one. The hearing proceeded, and before Alhuay was sworn in, the IJ emphasized that if Alhuay did not understand a question, she should tell him. Alhuay responded that she understood the IJ's instructions.

Before the interpreter arrived, Alhuay testified that she received permanent-resident status as the battered spouse of Quesnay, and that when she married Quesnay, she thought she was divorced from Saldana. Alhuay admitted that when she married Quesnay, she was not officially divorced from Saldana. Alhuay stated that she and Saldana had gone to her family lawyer in Peru and signed the papers but that the lawyer never finished the paperwork.

After the interpreter arrived, Alhuay admitted that, at her 1997 interview for

6

permanent-resident status, she told the interviewer that she was divorced from Saldana. However, she discovered that her attorney had not completed the Saldana divorce only after immigration authorities asked her to provide the Saldana divorce decree. Alhuay also submitted an affidavit from Saldana, in which he verified that he and Alhuay went to an attorney in Peru to process their divorce but learned years later that the divorce had not been finalized. When the IJ asked Alhuay about her representation on her 1993 Biographic Information form that she was never married, Alhuay replied that Quesnay completed the form for her, and they thought the blank for "FORMER HUSBANDS AND WIVES" referred to Quesnay's spouses, not Alhuay's. Although Alhuay admitted that she signed the form, she testified that Quesnay wrote the answers and that she did not look at the answers because she trusted him.

The IJ discussed Alhuay's 1993 application for her first Nevada license to marry Quesnay. The IJ noted that this 1993 license application would either support her contention that she thought she was divorced from Saldana or contain misrepresentations. The IJ thought the government had already met its burden at that point but continued the hearing to allow Alhuay to obtain the 1993 marriage license application.

**E. July 2008 Hearing**

At the next hearing, on July 30, 2008, McTyier again represented Alhuay. No interpreter was present. The IJ reviewed Alhuay's 1993 marriage license application and noted that it did not "help[] the case." In her 1993 application to marry Quesnay, Alhuay had disclosed neither her first marriage, to Saldana, nor her belief that she was divorced from Saldana. The IJ stated that it appeared Alhuay had made misrepresentations on the application and "engaged in marriage fraud" because "[i]f she thought she was divorced in Peru, she would have told the State of Nevada [in the 1993 marriage license application] that she was divorced in Peru." The IJ concluded:

> [Alhuay] told me during direct testimony that she thought she was divorced to somebody in Peru and she submitted a document from that person saying that she thought she was divorced. However, when she gets remarried in Nevada, you've just given me a document here that says she believes that she was divorced in Nevada on February 25, 1993. There's no basis for that. That's not her testimony and it's further misrepresentation in the case.[4]

On the issue of removability, the IJ ruled that "the Government ha[d] sustained its burden in [the] case." The IJ sustained the charges in the NTA, instructed Alhuay to file any applications for relief from removal, and set another hearing date.

**F. November 2008 Hearing**

---

[4] At this point in the proceedings, Alhuay still had not provided information to the IJ about her brief marriage to Diaz.

The proceedings continued on November 12, 2008. At that hearing, Miguel Mendizabel represented Alhuay. An interpreter was present for the entire hearing. Mendizabel questioned the IJ's basis for sustaining the removal charges against Alhuay and questioned the previous findings of fraud and misrepresentation. The IJ emphasized his finding that Alhuay "sat [t]here under oath and lied" about her belief that she was divorced in Peru. The IJ explained that his conclusion was based on Alhuay's misrepresentations of her marital history in both the documentary record and her hearing testimony.

Following the hearing, Alhuay applied for a waiver of removability under INA § 237(a)(1)(H), 8 U.S.C. § 1227(a)(1)(H), and cancellation of removal under INA § 240A, 8 U.S.C. § 1229b. A hearing on these applications was set for April 13, 2009. Prior to that hearing, Alhuay submitted numerous letters and documents attesting to her good character and her dedication as a parent.

## G. April 2009 Hearing

At the April 13, 2009 hearing, Mendizabel again represented Alhuay.[5] Alhuay testified that her son, Jesse Quesnay, had a history of epilepsy. Alhuay admitted that (1) she was married to Diaz for about six months, (2) she divorced Diaz before marrying Quesnay, and (3) she was not actually divorced from

---

[5] No interpreter was present at the April 13, 2009 hearing, and none was requested.

9

Saldana until 2003.[6] Alhuay reiterated her belief that she had divorced Saldana before coming to the United States. With respect to Alhuay's representation on her April 1993 Biographic Information form that she had never been married, Alhuay now claimed that she thought the forms were asking only about marriages in the United States. Alhuay claimed that she failed to list her 1992 marriage to Diaz on the 1993 form because, even though her marriage to Diaz was a marriage in the United States, it lasted for a very short time. Alhuay also testified that during her interview for permanent-resident status in 1997, the interviewer asked her how many times she had been married. In response, Alhuay told the interviewer about her marriage to Saldana, even though she stated on the 1993 form that she had never been married.

Though Alhuay's 2009 application for cancellation of removal stated that she had never been arrested, Alhuay testified that she was arrested twice since she arrived in the United States, both times involving arguments with Quesnay. Upon further questioning by the IJ, however, Alhuay admitted that she was arrested four times, including once for theft. Alhuay claimed that she misrepresented her arrests in her application for cancellation because she believed the question referred only

---

[6] Though Alhuay testified at the April 13, 2009 hearing that her divorce from Saldana was finalized in 2003, the divorce decree in the record shows that Alhuay's divorce from Saldana was not finalized until 2005.

to arrests in the last 10 years.

Alhuay testified initially that she had never returned to Peru since coming to the United States. Upon further questioning, however, she testified that she had been back six times since 1990.

## D. The IJ's Decision

In an oral decision on April 13, 2009, the IJ found that Alhuay was removable as charged and denied her applications for a waiver of removability and cancellation of removal. The IJ found that the government had proved factually that Alhuay was not eligible to adjust her status in 1997 because her marriage to Quesnay was invalid due to her earlier marriage to Saldana. As to whether Alhuay had procured her status adjustment "by fraud or willfully misrepresenting a material fact," INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i), the IJ found that Alhuay's explanation that she believed she was divorced from Saldana was not credible. The IJ recounted Alhuay's failure to disclose both her marriage to Saldana in her 1993 application to marry Quesnay in Nevada and her marriage to Diaz in her 1993 immigration forms. The IJ found "frivolous on its face" Alhuay's explanation that she did not mention her marriage to Diaz because it was so short. The IJ stated that throughout the proceeding, Alhuay seemed "to blame

11

someone, anyone," for the misrepresentations in the record. The IJ again found

Alhuay's "testimony to be not credible in this case," adding:

> [s]imply put, the Court does not believe very much of what [Alhuay] said in this case. She seems to explain away every inconsistency, and, frankly, appears to be engaged in one serial misrepresentation after another. Not only are the misrepresentations made on prior occasions, but they continue to be made before the Court.

The IJ denied Alhuay's application for a waiver of removability under INA

§ 237(a)(1)(H), 8 U.S.C. § 1227(a)(1)(H), on the merits and as a matter of

discretion. The IJ determined that Alhuay did not establish the requisite hardship.

Further, the IJ determined as a matter of discretion that Alhuay "ha[d] not been

truthful to tribunals in the past, . . . ha[d] not been truthful to the Court," and had

"engaged in a pattern and practice of misrepresentation" since she had been in the

United States.

The IJ also denied Alhuay's application for cancellation of removal under

INA § 240A, 8 U.S.C. § 1229b, because Alhuay had not demonstrated good moral

character in light of her four arrests. The IJ found that Alhuay had not

demonstrated hardship because (1) she could work in Peru and (2) her testimony

regarding her son's epilepsy, which she indicated he had not suffered in recent

years, was not corroborated by any documents. The IJ also denied cancellation of

removal "as a matter of discretion," based on Alhuay's untruthfulness and inconsistency. The IJ ordered Alhuay removed to Peru.

## E. Appeal to the BIA

In her 2009 appeal to the BIA, Alhuay argued that the IJ erred in finding her removable because, inter alia, (1) the government failed to prove that she knowingly made false representations, and (2) Alhuay's removal proceedings were barred by a five-year statute of limitations in INA § 246(a), 8 U.S.C. § 1256(a). Alhuay also claimed that she was denied a fair hearing because of the IJ's bias, the lack of an interpreter at crucial times, and Mendizabel's ineffective assistance of counsel. She further claimed that the IJ abused his discretion by denying her applications for relief in light of her positive personal characteristics, innocent misrepresentations, good moral character, and the hardship to her son that would result from her removal.

On October 22, 2010, the BIA dismissed Alhuay's appeal. The BIA affirmed the IJ's discretionary denial of a waiver of removability. The BIA determined that the government had shown that Alhuay "adjusted her status . . . by fraudulently claiming that she was abused by her spouse," and the government had specifically shown that her marriage to Quesnay was invalid because she was still

legally married to Saldana. The BIA concluded that the IJ "properly considered [Alhuay's] 'pattern and practice of misrepresentation'" in denying the waiver as a matter of discretion. The BIA cited Alhuay's failure to disclose her criminal history, her failure to disclose her marriage to Saldana on her 1993 Biographic Information form, and her "implausible" assumptions that the forms were inquiring about Quesnay's former spouses or about Alhuay's marriages only in the United States. The BIA concluded that Alhuay had "engaged in an intentional pattern of misrepresentation," that her positive characteristics did not outweigh her negative factors, and that the IJ's discretionary denial of the waiver of removability should not be disturbed. Following its precedent, the BIA also rejected Alhuay's argument that under INA § 246(a), 8 U.S.C. § 1256(a), removal proceedings against her were subject to a five-year statute of limitations. See In re Belenzo, 17 I. & N. Dec. 374, 384 (Att'y Gen. 1981).

With respect to Alhuay's application for cancellation of removal, the BIA agreed with the IJ that Alhuay did not show the requisite hardship to a qualifying relative. The BIA further noted that Alhuay did not provide adequate corroborative documentary evidence of her son's medical condition. Because it affirmed the denial of cancellation of removal due to the lack of hardship, the BIA

declined to address both the IJ's finding regarding Alhuay's moral character and the IJ's decision to deny relief as a matter of discretion.

The BIA also rejected Alhuay's claim that she did not receive a full and fair hearing due to "language problems" and found no evidence that Alhuay did not understand the questions or could not communicate her answers. The BIA found no inappropriate conduct by the IJ and noted that he granted many continuances to ensure that the parties were prepared. The BIA also found that Alhuay had failed to show that she was prejudiced by Mendizabel's allegedly ineffective performance.

## II. DISCUSSION

### A. Five-Year Time Period in 8 U.S.C. § 1256(a)

We first address whether INA § 246(a), 8 U.S.C. § 1256(a), applies to Alhuay's removal proceedings.[7] Section 1256(a) provides:

> If, at any time within five years after the status of a person has been otherwise adjusted . . . to that of an alien lawfully admitted for permanent residence, it shall appear to the satisfaction of the Attorney General that the person was not

---

[7] "The interpretation of a statute is a question of law . . . ." Corp. Mgmt. Advisors, Inc. v. Artjen Complexus, Inc., 561 F.3d 1294, 1296 (11th Cir. 2009). Because the INA permits review of "questions of law," INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D), we have jurisdiction to decide the narrow legal issue of whether the five-year limitation on the Attorney General's authority under INA § 246(a), 8 U.S.C. § 1256(a), applies only to rescissions of erroneous adjustments of status or also applies to removal proceedings.

in fact eligible for such adjustment of status, the Attorney General shall rescind the action taken granting an adjustment of status to such person and cancelling removal in the case of such person if that occurred and the person shall thereupon be subject to all provisions of this chapter to the same extent as if the adjustment of status had not been made. Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien under section 1229a of this title, and an order of removal issued by an immigration judge shall be sufficient to rescind the alien's status.

INA § 246(a), 8 U.S.C. § 1256(a).  Congress added the last sentence of § 1256(a) in 1996.  See Pub. L. No. 104-208, § 378(a), 110 Stat. 3009, 3009-649.[8]

Since 1962, the Attorney General has consistently interpreted § 1256(a) to limit only the government's power to rescind an erroneous adjustment of status more than five years after the adjustment.  See In re Belenzo, 17 I. & N. Dec. at 382; In re S-, 9 I. & N. Dec. 548, 548 (Att'y Gen. 1962).  Per the Attorney

---

[8] We note that the five-year time period in INA § 246(a), 8 U.S.C. § 1256(a), limits the Attorney General's duty to "rescind the action taken granting an adjustment of status" only when "it shall appear to the satisfaction of the Attorney General that the person was not in fact eligible for such adjustment of status" (emphasis added).  We do not decide here whether this language, which may confer some discretionary authority on the Attorney General, renders a rescission of status pursuant to the Attorney General's authority under this section an unreviewable "decision or action" under INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).  See Kucana v. Holder, 130 S. Ct. 827, 837–38 (2010).  We decide only that the application of INA § 246(a), 8 U.S.C. § 1256(a), to removal proceedings is a reviewable "question[] of law" under INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D).  Cf. Sukwanputra v. Gonzales, 434 F.3d 627 (3d Cir. 2006) (holding that the Attorney General's denial of an extension of the one-year asylum application filing deadline under INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D), is an unreviewable discretionary decision because § 1158(a)(2)(D) requires the applicant to "demonstrate to the satisfaction of the Attorney General" that the applicant qualifies for an exception (emphasis added)).

General's interpretation, § 1256(a) has no effect on the government's power to remove an alien no matter when that alien's status was erroneously adjusted. See Stolaj v. Holder, 577 F.3d 651, 656 (6th Cir. 2009).[9]

Alhuay argues that § 1256(a) prohibits both removal and rescission more than five years after an erroneous adjustment of status. Alhuay argues that § 1256(a) bars her removal because she received her adjustment of status in 1997, more than nine years before the government brought the 2007 removal proceedings against her.

Whether § 1256(a) applies to removal proceedings is an issue of first impression in our circuit. Without addressing the present removal issue, we previously explained in dicta that § 1256(a) "establish[es] a five-year statute of limitations for the Attorney General to bring rescission proceedings and further clarifies that an IJ's order of removal may also act as a rescission of status even if it is issued after that five year period." Savoury v. U.S. Att'y Gen., 449 F.3d 1307, 1314 n.2 (11th Cir. 2006). Though this explanation implicitly acknowledges

---

[9] We review questions of statutory interpretation de novo but defer under Chevron to the BIA or the Attorney General's interpretation of the INA "if it is reasonable and does not contradict the clear intent of Congress." Jaggernauth v. U.S. Att'y Gen., 432 F.3d 1346, 1350 (11th Cir. 2005) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–44, 104 S. Ct. 2778, 2781–82 (1984)).

removal proceedings initiated beyond the five-year limit, we now squarely answer the question of whether § 1256(a) applies to removal proceedings.

Four circuits have already held that § 1256(a) does not apply to bar the government from removing an alien merely because that alien received an erroneous adjustment of status more than five years earlier. See Stolaj, 577 F.3d at 656 ("By its own terms, § 1256 places a time bar only on the Government's attempt to rescind the status of a lawful permanent resident, and does not apply to removal proceedings."); Kim v. Holder, 560 F.3d 833, 837 (8th Cir. 2009) ("On its face, § 1256(a) only discusses the five-year statute of limitations in terms of rescinding a status adjustment . . . ."); Asika v. Ashcroft, 362 F.3d 264, 269–71 (4th Cir. 2004) (deferring to the Attorney General's interpretation that § 1256 does not limit the government's power to remove an alien more than five years after an erroneous adjustment of status); Oloteo v. INS, 643 F.2d 679, 682–83 (9th Cir. 1981) ("Congress has seen fit to do away with statutes of limitation with regard to deportation proceedings, but in its wisdom has engrafted such a limit to the rescission of status proceeding alone." (footnote omitted)).[10]  In each of these

---

[10] But cf. Garcia v. Att'y Gen., 553 F.3d 724, 728 (3d Cir. 2009) (holding that the last sentence of § 1256(a), added by amendment in 1996, did not limit the statute's reach to rescission of adjustment of status).  Garcia is not only an outlier, but included a dissenting opinion. See id. at 729 (Fuentes, J., dissenting) ("By its own terms, [§ 1256(a)] expressly applies

18

decisions, the court concluded that § 1256(a) distinguishes between rescission and removal and applies only to rescission.

We agree with the Fourth, Sixth, Eighth, and Ninth Circuits and now hold that the plain language of § 1256(a) does not apply to removal proceedings. The first sentence of § 1256(a) requires the Attorney General to "rescind the action taken granting an adjustment of status and cancelling removal" with respect to persons who received an erroneous adjustment of status within the previous five years. This provision merely mandates the rescission of adjustment of status for persons who fall into the prescribed category.[11] It says nothing about beginning

---

its five-year time limitation only to when the 'Attorney General shall <u>rescind</u>' the adjustment action."). <u>Garcia</u> relied on the Third Circuit's earlier decision in <u>Bamidele v. INS</u>, 99 F.3d 557, 559 (3d Cir. 1996) (holding that § 1256(a) applies to removal proceedings and vacating a deportation order issued more than five years after the government discovered that the petitioner's marriage was fraudulent).

[11] In considering the application of § 1256(a) to removal proceedings, the Third, Fourth, Sixth, Eighth, and Ninth Circuits each describe that section's five-year period as a statute of limitations that bars the Attorney General from rescinding an erroneous adjustment of status after five years. <u>See, e.g.</u>, <u>Stolaj</u>, 577 F.3d at 655 (describing "five-year statute of limitations"); <u>Garcia</u>, 553 F.3d at 728 n.3 (describing "five-year limitation"). In dicta, we have also described the five-year period in § 1256(a) as a "statute of limitations." <u>Savoury</u>, 449 F.3d at 1314 n.2. For decades, the BIA has also interpreted § 1256(a) as a statute of limitations. <u>See, e.g.</u>, <u>In re S-</u>, 9 I. & N. Dec. at 554 ("[T]he effect of the five-year limitation on rescission is simply to bar the Attorney General from returning an alien with adjusted status to the category of nonimmigrant.").
We note that the statute is, at best, unclear in this regard: the language of § 1256(a) requires only that the Attorney General rescind the status of aliens who, in his judgment, received an erroneous status adjustment <u>less</u> than five years earlier; it does not explicitly <u>prohibit</u> the Attorney General from rescinding the status of aliens who received an erroneous status adjustment <u>more</u> than five years earlier. In this case, we do not confront the application of

19

removal proceedings or the Attorney General's power to remove any alien.

The last sentence of § 1256(a), added by Congress in 1996, supports this reading of the statute. Because § 1256(a) does not require the Attorney General to rescind an erroneous adjustment of status "prior to commencement of procedures to remove the alien," § 1256(a) draws a clear distinction between rescission and removal. Accordingly, to the extent § 1256(a) limits the Attorney General's power to rescind adjustment of status, it does not implicitly limit the Attorney General's power to remove. See Stolaj, 577 F.3d at 656 ("This amendment explicitly allows the Government to initiate removal proceedings . . . without first rescinding the alien's permanent resident status.").

This last sentence also explains why the provision, "an order of removal . . . shall be sufficient to rescind the alien's status," does not, as Alhuay argues, render the remainder of § 1256(a) a nullity. Alhuay might be correct if the Attorney General were required to rescind an alien's adjustment of status before removing her. In that case, ordering removal would arguably be an end-run around the five-year rescission window to some extent. But the last sentence in § 1256(a)

§ 1256(a) to the rescission of an erroneous status adjustment more than five years earlier. However, because we defer to the BIA's reasonable interpretations of ambiguous language in the INA, we merely assume here that the § 1256(a) restricts the Attorney General's authority consistent with the BIA's interpretation of the statute. See Jaggernauth, 432 F.3d at 1350.

unequivocally permits the Attorney General to remove an alien without first rescinding her status.  INA § 246(a), 8 U.S.C. § 1256(a) ("Nothing in this subsection shall require the Attorney General to rescind the alien's status prior to commencement of procedures to remove the alien . . . .").

Our interpretation of § 1256(a) is also consistent with the statute's apparent objective of protecting aliens who have long relied on their changed immigration status.  Because the procedural protections available to an alien in removal proceedings are far more substantial than those associated with rescission of an adjustment of status, § 1256(a) prevents the government from summarily rescinding the adjustment of status of an alien who received the adjustment more than five years earlier.  Compare INA § 240, 8 U.S.C. § 1229a, with INA § 246(a), 8 U.S.C. § 1256(a).  Rather, the government's removal case must survive the more extensive proceedings available to an alien in removal proceedings.  Asika, 362 F.3d at 270 (explaining that § 1256(a) protects aliens "who have been in the country for more than five years after their status has been erroneously adjusted, by forcing the Attorney General to establish their deportability through the more rigorous procedures of removal").

The disjunction between removal and rescission procedures under the INA

21

further undermines Alhuay's claim that § 1256(a) treats removal "as essentially equivalent to rescission of status under the statute." If § 1256(a)'s limit on the Attorney General's authority to rescind adjustments of status were applicable to removal, then these limits would likely appear in the parts of the INA governing removal. But as the Fourth Circuit pointed out in <u>Asika</u>, "the provisions of the [INA] that govern deportation refer neither to section [1256] nor the statute of limitations that it purportedly creates, nor, for that matter, to any time limitation on deportation at all." 362 F.3d at 269; <u>see</u> <u>Kim</u>, 560 F.3d at 837–38 (same). Given the lack of confirmation elsewhere in the INA that § 1256(a) curtails the government's power to remove aliens, we decline to infer that § 1256(a) so substantially limits the Attorney General's removal power.

## B. Grounds for Removability

We next consider Alhuay's claim that the government failed to prove that she had, "by fraud or willfully misrepresenting a material fact," procured "a visa, other documentation, or admission into the United States or other benefit," as required for removal under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i).[12]

_____

[12] We "review[] the IJ's factual findings and credibility determinations as to whether the [agency] presented clear and convincing evidence of removal under the substantial evidence test." <u>Bigler v. U.S. Att'y Gen.</u>, 451 F.3d 728, 732 (11th Cir. 2006) (citations omitted). The substantial evidence test "requires reversal of factual findings only if the evidence presented

After full record review, we conclude that substantial evidence supports the IJ and BIA's findings that Alhuay procured a benefit—her adjustment of status as a self-petitioning spouse—through fraud or willful misrepresentation.

First, Alhuay's 1975 marriage certificate to Carlos Saldana shows that she was married before coming to the United States. Her divorce from Saldana was not finalized until 2005. Alhuay thus was not divorced from Saldana at the time she married Quesnay in 1993 or when she remarried Quesnay in 1997. At her June 26, 2008 hearing, Alhuay admitted that she was not officially divorced from Saldana at the time she married Quesnay in 1993.

As a result, Alhuay was not legally married to Quesnay in 1995, when she filed for—and in 1996 received—special immigrant status as a self-petitioning "spouse" of an abusive Quesnay. Nor was Alhuay legally married to Quesnay in December 1997, when her status was adjusted to lawful permanent resident based on her approved self-petition. At a minimum, she concealed certain material facts, including that she had married Saldana and had not divorced him. Indeed, she

---

compels a contrary conclusion." Id.; see Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). This test is "highly deferential." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). In addition, "[w]e review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion." Id.

23

concealed the Saldana marriage altogether.

Second, substantial evidence supports the IJ's express findings that Alhuay was not credible. For example, at the April 13, 2009 hearing, Alhuay claimed that she believed she had divorced Carlos Saldana before she arrived in the United States in 1990 and before her marriages in 1992 to José Diaz and then in 1993 to Abel Quesnay. As the IJ noted, the documentary record, among other things, refutes Alhuay's claim. In her 1993 Nevada application for a license to marry Quesnay, Alhuay stated that she was married only once before and that her first marriage ended in divorce in February 1993 (which is not before, but three years after she came to the United States, in 1990).[13] In any event, in her first Biographic Information form, also filed in 1993, Alhuay claimed that she was "NEVER MARRIED BEFORE" she married Quesnay. In fact, at the time Alhuay completed these two forms, she had been married twice before—first to Saldana in 1975 and then to Diaz in 1992. Furthermore, in her second application for a license to marry Quesnay, completed in 1997, Alhuay falsely claimed that she had only one prior marriage and that it had ended in divorce. In fact, at that time Alhuay already had been married three times.

---

[13] Alhuay admits that this is her divorce from Diaz in February 1993.

24

We recognize that Alhuay testified that her 1993 Biographic Information form stated that she was "NEVER MARRIED BEFORE" because she and Quesnay, who filled out the form together, believed the question pertained to only his prior marriages. However, one year later, at the April 13, 2009 hearing, Alhuay testified that the discrepancy on this form was due to her belief that the form did not require her to report her foreign marriages (Saldana) or marriages of short duration (Diaz). In any event, the form instructs the applicant to list "former husbands or wives" and does not state that certain marriages are exempt from reporting.[14]

Alhuay's inconsistent testimony regarding her criminal history and her travels to Peru further supports the IJ's findings that Alhuay was not credible. Alhuay initially testified that she was arrested twice since she entered the United States, but later she admitted that she was arrested four times. Alhuay testified that she had never returned to Peru since coming to the United States, but upon further questioning, she testified that she had been back six times since 1990.

_____

[14] Alhuay's 1997 Biographic Information does not cure her prior fraud or misrepresentations. On that form, Alhuay reported her prior marriages to Saldana, Diaz, and Quesnay. But it also reported her purported divorce from Saldana, which did not occur until 2005. In any event, Alhuay's application for permanent-resident status in 1997 was based on her self-petition, approved in 1996, which was obtained through fraud or willful misrepresentation.

25

In the final analysis, the above record does not compel the conclusion that Alhuay did not procure her special immigration status (as the battered spouse of Quesnay) by fraud or by willfully misrepresenting a material fact, her marital status, in her self-petition. See Adefemi, 386 F.3d at 1027. Accordingly, substantial evidence supports the IJ's and the BIA's finding that Alhuay is removable under INA § 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i).

## C. Constitutional Claims

We next consider Alhuay's due process claims that she was denied a full and fair hearing before the IJ due to the lack of an interpreter and the IJ's bias. "We review constitutional challenges, including alleged due process violations, de novo." Lapaix v. U.S. Att'y Gen., 605 F.3d 1138, 1143 (11th Cir. 2010). "Due process is satisfied only by a full and fair hearing." Ibrahim v. INS, 821 F.2d 1547, 1550 (11th Cir. 1987).[15]

Petitioners in removal proceedings are entitled to the protections of the Fifth

---

[15] We retain jurisdiction to review "constitutional claims or questions of law" under INA § 242(a)(2)(D), § 1252(a)(2)(D). Allegations of constitutional violations must at least be "colorable." Arias v. U.S. Att'y Gen., 482 F.3d 1281, 1284 (11th Cir. 2007). "[W]e lack jurisdiction over abuse of discretion claims merely couched in constitutional language." Id. We also lack jurisdiction "[w]here a constitutional claim has no merit." Gonzalez-Oropeza v. U.S. Att'y Gen., 321 F.3d 1331, 1333 (11th Cir. 2003). Because Alhuay's petition raises colorable constitutional claims, we have jurisdiction to review them. See Arias, 482 F.3d at 1284.

Amendment. Lapaix, 605 F.3d at 1143. To prevail on a due process claim, "the petitioner must show that she was deprived of liberty without due process of law and that the purported errors caused her substantial prejudice. To show substantial prejudice, an alien must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different." Id. (citations omitted). However, "the failure to receive relief that is purely discretionary in nature does not amount to a deprivation of a liberty interest." Scheerer v. U.S. Att'y Gen., 513 F.3d 1244, 1253 (11th Cir. 2008).

Although acknowledging that an interpreter was present at some of the hearings, Alhuay argues that she gave substantial portions of her testimony when an interpreter was not present and, because of her difficulty with the English language, the lack of an interpreter prejudiced her case.

After review of the record of the hearings in this case, we conclude that Alhuay has not shown that the lack of an interpreter prejudiced her in any way, much less to the extent the outcome of the proceedings would have been different. The transcript from the June 26, 2008 hearing shows that an interpreter arrived midway through the hearing but was present during the majority of Alhuay's testimony. Before the interpreter arrived, the IJ warned Alhuay that she should tell

27

the IJ if she did not understand a question, and Alhuay indicated that she understood the IJ's instructions. Further, prior to the interpreter's arrival, Alhuay primarily described her immigration history. During eight pages of testimony, Alhuay discussed her belief that she was divorced from Saldana at the time she married Quesnay and her realization that she and Saldana were still legally married after she married Quesnay. After the interpreter's arrival, however, Alhuay repeated this particular testimony.

No interpreter was present at the July 30, 2008 hearing, but Alhuay did not testify at that hearing and was represented by counsel. To the extent an interpreter was not present at the hearings addressing Alhuay's applications for a waiver of removability and cancellation of removal, Alhuay has no cognizable due process interest because those forms of relief are discretionary. See Scheerer, 513 F.3d at 1253.

We also reject Alhuay's claim that she was denied a full and fair hearing due to the IJ's purported bias. The record shows that the IJ gave Alhuay ample opportunity to testify and to present evidence on her behalf. The IJ continued the hearing numerous times to let Alhuay prepare her case, obtain evidence – including her 1993 application for a license to marry Quesnay – and submit her

28

applications for relief from removal. Our review of the hearing transcripts reveals no bias on the part of the IJ. Rather, in light of the documentary evidence and Alhuay's conflicting testimony, the IJ's comments and questions simply reflect his rejection of Alhuay's incredible explanations for the discrepancies in her records and testimony.[16]

## D. Waiver of Removability and Cancellation of Removal

The BIA affirmed the IJ's denial of Alhuay's application for waiver of removability under INA § 237(a)(1)(H), 8 U.S.C. § 1227(a)(1)(H). The plain language of § 1227(a)(1)(H) expressly commits the power to waive removal for certain aliens to "the discretion of the Attorney General." INA § 237(a)(1)(H), 8 U.S.C. § 1227(a)(1)(H). We agree with four of our sister circuits that decisions under 8 U.S.C. § 1227(a)(1)(H) "unambiguously fall[] within the jurisdiction-stripping provision of § 1252(a)(2)(B)(ii)." Ahmed v. Holder, 624 F.3d 150, 153 (2d Cir. 2010); see also Zajanckauskas v. Holder, 611 F.3d 87, 89–90 (1st Cir. 2010) (holding that the court has no jurisdiction to review a denial of a waiver under § 1227(a)(1)(H)); Singh v. Gonzales, 451 F.3d 400, 410–11 (6th Cir. 2006) (same); San Pedro v. Ashcroft, 395 F.3d 1156, 1157–58 (9th Cir. 2005) (same).

---

[16] We also reject Alhuay's unfounded claims that Miguel Mendizabel, her second attorney, rendered ineffective assistance of counsel or that she was prejudiced thereby.

Consequently, we lack jurisdiction to review the BIA's discretionary denial of Alhuay's application for a waiver of removability.

We also lack jurisdiction to review the BIA's denial of Alhuay's application for cancellation of removal under INA § 240A, 8 U.S.C. § 1229b. Martinez v. U.S. Att'y Gen., 446 F.3d 1219, 1221–23 (11th Cir. 2006); see 8 U.S.C. § 1252(a)(2)(B)(i) (expressly stripping the court's jurisdiction to review "any judgment regarding the granting of relief under section . . . 1229b" (emphasis added)). The addition of § 1252(a)(2)(D) in 2005 does not change that result.[17] That section permits the courts to review "constitutional claims or questions of law" notwithstanding the jurisdiction-stripping provisions of § 1252(a)(2)(B) and (C). INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D). Because the BIA affirmed the IJ's denial of Alhuay's application for cancellation of removal not as a matter of discretion, but because she failed to demonstrate "exceptional and extremely unusual hardship" to a qualifying relative, INA § 240A(b)(1)(D), 8 U.S.C. § 1229b(b)(1)(D), Alhuay claims that her petition raises only constitutional and legal questions. But our decision in Martinez forecloses this argument. In Martinez, we further held that § 1252(a)(2)(D) does not restore our jurisdiction in

---

[17] Congress added § 1252(a)(2)(D) in 2005. See REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302.

30

cases where the BIA affirms an IJ's order due to the petitioner's failure to demonstrate the requisite hardship. Martinez, 446 F.3d at 1222. Following four other circuits, the Martinez Court explained that such challenges are not constitutional claims or questions of law because what constitutes an "exceptional and extremely unusual hardship" is itself a discretionary determination. Id. (citing cases).

Accordingly, to the extent Alhuay petitions for review of the denial of her applications for waiver of removability and cancellation of removal, we DISMISS the petition for lack of jurisdiction.

## III. CONCLUSION

For the foregoing reasons, Alhuay's petition for review is **DISMISSED** in part and **DENIED** in part.