[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14020
Non-Argument Calendar
_____

Agency No. A093-134-549


USAMA MOHAMED EL-ABAIDY,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(July 21, 2015)

Before TJOFLAT, JORDAN and JILL PRYOR , Circuit Judges.

PER CURIAM:

I.

The petitioner, Usama Mohamed El-Abaidy, is a native and citizen of Egypt. He entered the United States in New York City on September 21, 1989, as a nonimmigrant, with authorization to remain in this country until March 20, 1990. El-Abaidy has remained in this country ever since.

On June 10, 1991, El-Abaidy filed an asylum application using the alias "Ussama Mohamed Elgareab," in which he stated that that he arrived in the United States in San Diego, California, on October 19, 1981; that the last school he attended was Ibrahimya Secondary School from 1978 to 1980; and, in response to the question, "Have you taken any action that you believe will result in persecution in your home country," he wrote:

> The fanatical Muslims do not allow those who do not sympathize with their cause to live in peace. They are constantly harassing and physically abusing you. The situation between a young girl and myself also has placed my life in jeopardy. Her father is a very powerful man and will stop at nothing to kill me. The police cannot and will not provide the necessary protection.

Administrative Record at 725–29. The Immigration and Naturalization Service ("INS") denied El-Abaidy's asylum application on May 8, 1992.

Despite the INS's denial of El-Abaidy's asylum application, he proceeded to behave as if he had been granted asylum and had become a United States citizen. For example, on November 1, 1996, El-Abaidy registered to vote in Broward County, Florida. Administrative Record at 999. On July 12, 2001, he applied for

2

adjustment of status under the Legal Immigration Family Equity Act ("LIFE application"). In his LIFE application, El-Abaidy represented that he had entered the United States through New York City on a B-2 visa issued on July 31, 1989; had withdrawn his LIFE application in Miami, Florida, in June 1998; and had never attempted to procure any immigration benefit through fraud. Administrative Record at 744–46. Additionally, on January 17, 2002, while El-Abaidy's application for adjustment of status was pending, he represented himself as a United States citizen on an application for a mortgage on his Broward County residence. Administrative Record at 990–1010. On July 11, 2002, he served as a juror in the Broward County Circuit Court and was paid $15 (as an unemployed person) for his service. Administrative Record at 1009–10. And, in November 2002, El-Abaidy voted in the general election in Broward County, just as he had in 2000. Administrative Record at 1001.

On February 3, 2005, the United States Citizen and Immigration Service ("USCIS") denied El-Abaidy's LIFE application because he failed to establish eligibility for adjustment of status with credible evidence. Administrative Record at 751. The USCIS found that several documents El-Abaidy had submitted in support of his application were fraudulent, among others: airline tickets purportedly issued by Trans World Airlines and American Airlines; a letter from a Mr. Elabaldy, stating that El-Abaidy is a "nice, kind, and hard worker"; a letter

from Metropolitan Hospital Center, attesting to surgery performed on El-Abaidy; and a letter from Phoenix Abatement-Control, Inc., attesting to El-Abaidy's employment.

On February 17, 2005, shortly after the USCIS issued its decision, El-Abaidy married his second wife, Sylvia Roderick, a United States citizen. Administrative Record at 458. On March 8, 2005, she filed a petition for alien relative on behalf of El-Abaidy, Administrative Record at 753–54, and El-Abaidy filed second LIFE application, Administrative Record at 759–62.

USCIS interviewed El-Abaidy and his new wife in connection with these applications on September 9, 2008. During the interview, El-Abaidy denied ever representing himself as a U.S. citizen or voting in any election. But he executed an affidavit in which he admitted that the documents he had submitted with his LIFE application were fraudulent. Administrative Record at 752. Having admitted this, and because information he had provided on his asylum application was incorrect, El-Abaidy immediately filed an application for waiver of inadmissibility under the Immigration and Nationality Act ("INA") § 212(i), 8 U.S.C. § 1182(i). USCIS denied El-Abaidy's second LIFE application on September 23, 2008.

On March 24, 2011, the Department of Homeland Security ("DHS") served El-Abaidy with a Notice to Appear, charging El-Abaidy as removable pursuant to INA § 237(a)(1)(B), 3(D), 6(A), 8 U.S.C. § 1227(a)(1)(B), 3(D), 6(A) as a non-

4

immigrant who had remained in the United States for a longer period than authorized, an alien who had falsely represented himself as a U.S. citizen, and an alien who had voted in violation of law, respectively.  El-Abaidy admitted these factual allegations and conceded his removability.

On November 22, 2011, El-Abaidy filed a new application for asylum, withholding of removal, and Convention against Torture ("CAT") protection.  In his application, he stated that he feared returning to Egypt because he would be "harassed, physically abused, tortured and killed by fanatical/extremist Muslims such as the Muslim Brotherhood, as well as members of the Egyptian government, military and police."  Essentially, El-Abaidy contended that he would be targeted in Egypt for three reasons: (1) he had lived in the United States since 1989 and would be perceived as an American "collaborator" or "spy"; (2) he had cooperated and assisted the FBI and would be accused and persecuted as a "spy" and "traitor and enemy of Egypt"; and (3) he had married a Christian woman and a daughter had been born in the United States, and if removed with him to Egypt, his family would be persecuted by both Christian and Islamic extremists.  In addition to his own statement, El Abaidy provided the expert opinion of Dr. Shaul M. Gabbay,[1]

---

[1] Dr. Shaul M. Gabbay was formerly the Executive Director of the Institute for the Study of Israel in the Middle East at the University of Denver.  According to Dr. Gabbay, El-Abaidy, if removed to Egypt, would face charges that he was a spy for the United States due to his cooperation with the FBI; would be taken into custody and questioned and, if charged with

several news items discussing the Muslim Brotherhood, and a Country Report on human rights in Egypt.

El-Abaidy augmented his asylum application on April 25, 2012, with his own affidavit and additional exhibits. In his affidavit, El-Abaidy stated that his full name was Osama Mohamed El Ghareeb Mohamed El-Abaidy; that he had lied in his July 12, 2001, LIFE application because he was desperate to obtain an adjustment of status after having been denied asylum, Administrative Record at 578; that during his interview with USCIS in September 2008, he forgot to mention that in his initial asylum application he had falsely represented the date, place, and manner of his entry into the United States, Administrative Record at 578; that he did not intend to lie about his citizenship in his mortgage application in January 2002, Administrative Record at 579; that he signed the application without realizing he had represented to the loan officer that he was an American citizen, Administrative Record at 579; that he acted out of desperation and did not read what he was signing when he registered to vote in 1996, Administrative Record at 579; that he voted in the general elections because he got "caught up in the moment and was pressured by friends and neighbors," Administrative Record

---

espionage, would be imprisoned and likely tortured; and would be considered a traitor to Islam and an infidel because of his marriage to an American Christian.

at 579; and that although he was summoned for jury service, he was not chosen, and the $15 he received was for parking, Administrative Record at 580.

Aside from his affidavit, El-Abaidy presented the report of a psychological evaluation made by Dr. Shatha Atiya, stating that El-Abaidy felt "depressed, overwhelmed and reported experiencing symptoms . . . consistent with those of . . . Posttraumatic Stress Disorder; including intrusive experiences, anxious arousal, irritability, avoidance, and numbing." Administrative Record at 618. Her opinion was that "denying Mr. Elabaidy [sic] his pending change of status application, by the Immigration Service, and forcing him to exit this Country would have extremely detrimental effects on this patient's psychological state, physical health, as well as that of his wife and child." Administrative Record at 622. El-Abaidy also submitted the results of a polygraph examination conducted by Richard Keifner, a former FBI Polygraph Program Coordinator. Keifner found that when asked if he was truthful in what he stated in his asylum application, El-Abaidy answered "Yes"; that he did not deliberately hide anything relevant to his application; that his examination answers indicated that "the probability of deception was less than .01"; and that "the probability of deception was less than .03" with respect to his statements that the FBI asked him for assistance and paid him $5,000 for the information he provided. Administrative Record at 699–700.

7

At a hearing before the Immigration Judge ("IJ") on the merits of El-Abaidy's asylum application on May 10, 2012, El-Abaidy proffered the results of the polygraph examination and the psychological examination; medical records from Cleveland Clinic Hospital and Clinics; news articles on Egypt; a notice of the bankruptcy case El-Abaidy had filed and the testimony of his bankruptcy attorney to establish his "good faith efforts and attempts to settle with creditors"; and the affidavit of his wife, Sylvia El-Abaidy. The IJ sustained DHS's objections to the results of the polygraph and the psychological examinations, concluding that the former were unreliable and the latter were irrelevant to the withholding-of-removal and CAT-relief issues, i.e., El-Abaidy's risk of suffering persecution or torture if returned to Egypt. Administrative Record at 148–49. The IJ ruled the testimony of El-Abaidy's bankruptcy attorney to be irrelevant. Administrative Record at 392–95. The IJ sustained DHS's objection to El-Abaidy's medical records of his gastric bypass surgery, which El-Abaidy offered to prove he had suffered stress-related health complications caused by his fear of returning to Egypt, on the ground that the records revealed that the surgery was required because El-Abaidy suffered from gastroparesis and obesity. Administrative Record at 149. The IJ overruled DHS's objection to Dr. Gabbay's testimony, stating that it would provide helpful background information. However, because the IJ found El-Abaidy's

8

testimony not credible, Dr. Gabbay's testimony became "inconsequential to the outcome of the removal proceeding." Administrative Record at 149 n.5.

After hearing El-Abaidy's testimony, the IJ found the testimony not credible for several reasons: his "repetitive lies to the immigration officials throughout the asylum process", Administrative Record at 155; his "decision to provide erroneous information concerning his entry into the United States on his June 10, 1991 asylum application," Administrative Record at 156; his admittedly fraudulent July 12, 2001 LIFE Act application, Administrative Record at 156–57; the "lies [he] told . . . during his September 9, 2008 USCIS adjustment of status interview," Administrative Record at 157; and his "inability to provide internally consistent testimony concerning his registration to vote," Administrative Record at 158. The IJ summed it up with this statement:

> Over the years, [El-Abaidy] has lied on his various applications for relief, lied to immigration officials during interviews, and submitted fraudulent documents to immigration services. Whenever he has been caught, [he] has provided meager excuses, begged for forgiveness, and then promptly lied again. Given this history of dishonesty, the Court is unable to rely on testimony [El-Abaidy] provided in Court.

Administrative Record at 158.

In addition to finding El-Abaidy not credible, the IJ concluded that El-Abaidy failed to provide the essential corroborating evidence necessary to meet his burden of proof. None of his documents referenced his alleged connection with FBI agents or established that his alleged status as an FBI informant would be

9

disclosed to the Egyptian government or would fall into the hands of Muslim extremists.

The IJ denied El-Abaidy's application for asylum, withholding of removal and CAT relief and ordered his removal. El-Abaidy timely appealed the decision to the Board of Immigration Appeals ("BIA"), arguing that the IJ erred in concluding that he failed to make out a case for asylum, withholding of removal and CAT relief. The IJ came to this erroneous conclusion, he contended, because the IJ failed to give proper weight to the findings and testimony of Dr. Gabbay, and improperly excluded Dr. Atiya's psychological report, the testimony of his bankruptcy attorney, and the results of the polygraph examination. El-Abaidy contended, in addition, that the IJ infused prejudicial and unrelated instances of his past conduct of lying into the immigration proceedings in order to undercut his credibility.

The BIA affirmed the IJ's decision on August 26, 2014. It concluded that the IJ's adverse credibility findings were not clearly erroneous, that her evidentiary rulings fell well within her discretion, and that El-Abaidy failed to establish a case for asylum, withholding-of-removal, or CAT relief. El-Abaidy now petitions this court to review the BIA's decision.

El-Abaidy argues that, through his own testimony and that of an expert witness, Dr. Gabbay, he established that, if returned to Egypt, he would face

10

persecution or torture because of his marriage to a Christian, his prior voluntary cooperation with the FBI, his association with the United States, his moderate religious beliefs, and his sudden appearance in Egypt following deportation. He also contends that the IJ and BIA erred in finding his testimony not credible due to irrelevant conduct on his part that occurred long ago, and that the IJ denied him due process of law by excluding his bankruptcy attorney's testimony, Dr. Atiya's psychological report, and the results of the polygraph examination.

## II.

We generally review the BIA's decision alone unless the BIA expressly adopted the IJ's decision. *Ruiz v. Gonzales*, 479 F.3d 762, 765 (11th Cir. 2007). Where, as here, the BIA explicitly agrees with the IJ's findings, we review both the IJ's and the BIA's expressions of such findings. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). We consider the evidence in the record, and all inferences it reasonably yields, in the light most favorable to the BIA's decision, and review the findings of fact, including findings of credibility, under the substantial-evidence test. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005). We will not disregard a finding of fact unless the evidence compels a contrary finding. *Id.* at 1287. At the end of the day, we must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.*

11

III.

A.

To be eligible for asylum, an alien must meet the definition of "refugee" set out in Immigration and Nationality Act ("INA").  A refugee is

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  The alien bears the burden of proving that he or she is a refugee.  INA § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i).  The alien must present specific and credible evidence demonstrating that he or she (1) was persecuted in the past based on one of the protected grounds, or (2) has a well-founded fear that he or she will be persecuted in the future based on one of the protected grounds.  *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006).  The protected ground must be "at least one central reason" for the persecution.  INA § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i).

Demonstrating past persecution creates a rebuttable presumption that the alien has a well-founded fear of future persecution.  *Ruiz*, 440 F.3d at 1257.  If the alien cannot show past persecution, the alien must establish a well-founded fear of future persecution that is subjectively genuine and objectively reasonable.  *Id.*  An

12

alien's credible testimony that he or she fears persecution can satisfy the subjective component. *Id.* To satisfy the objective component, the alien must either show past persecution or present specific, detailed facts indicating a good reason to fear that he or she will be singled out for future persecution. *Id.* at 1257–58.

To establish eligibility for withholding of removal under the INA, the alien must demonstrate that if removed, his or her life or freedom would be threatened because of his or her race, religion, nationality, membership in a particular social group, or political opinion. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005). The standard for withholding of removal is "more stringent" than the standard for asylum. *Id.* The alien must show that it is more likely than not that he or she will be persecuted or tortured upon returning to his or her country. *Id.* To establish eligibility for CAT relief, the alien must show that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1303 (11th Cir. 2001). If an alien fails to establish a claim of asylum on the merits, the alien is generally precluded from establishing eligibility for withholding-of-removal or CAT relief. *Id.* at 1292–93, 1303–04.

An adverse credibility determination standing alone is sufficient to support the denial of asylum where there is no evidence of persecution other than the alien's testimony. *Forgue*, 401 F.3d at 1287. However, if the alien produces other

evidence of persecution, the IJ must consider that evidence and may not rely solely on the adverse credibility determination. *Id.* If the IJ makes an adverse credibility determination, the alien must establish that such determination was either not supported by specific, cogent reasons or not based on substantial evidence in order to prevail on appellate review. *Id*.

To determine whether the alien's testimony is credible, the IJ may consider the totality of the circumstances and all relevant factors, including: (1) the alien's demeanor, candor, and responsiveness; (2) the plausibility of the alien's testimony; (3) the consistency between the alien's oral and written statements, whenever made, and the circumstances in which the statements were made; (4) the internal consistency of each statement; (5) the consistency of the alien's statements with other evidence in the record; and (6) any inaccuracies or falsehoods in the alien's statements. INA § 208(b)(1)(B)(iii), 8 U.S.C. § 1158(b)(1)(B)(iii). The inconsistencies, inaccuracies, or falsehoods need not go to the heart of the applicant's claim. *Id.* Thus, an IJ may find an alien's testimony not credible based in part on prior acts of fraud and dishonesty even when the acts were unrelated to the present application. *See Alim v. Gonzales*, 446 F.3d 1239, 1255–56 (11th Cir. 2006) (determining that the IJ's adverse credibility finding was supported by substantial evidence when the IJ's finding was based in part on the applicant's commission of multiple fraudulent acts, including deserting from the Syrian

14

military, exiting Syria illegally, entering the United States by fraud, and lying on an application for an adjustment of status).  Omissions in the alien's asylum application may also support an adverse credibility finding.  *See Forgue*, 401 F.3d at 1287.

We conclude that substantial evidence supports the IJ's and BIA's denial of El-Abaidy's application for asylum, withholding of removal, and CAT relief based on an adverse credibility finding.  The adverse credibility finding was founded on specific, cogent reasons, which included inconsistencies in El-Abaidy's testimony as well as El-Abaidy's history of lying to immigration officials and submitting fraudulent documents in order to obtain immigration benefits.  Substantial evidence supports this finding, given that documentary evidence contradicted a portion of El-Abaidy's testimony, and El-Abaidy repeatedly admitted under oath that he lied in prior immigration applications and submitted fraudulent documents in support of a prior application.  Finally, El-Abaidy offered no evidence establishing that he worked with the FBI, and his expert witness's testimony was insufficient to establish that he had an objectively reasonable fear of future persecution.

## B.

Aliens are entitled to due process of law in removal proceedings.  *Alhuay v. U.S. Att'y Gen.*, 661 F.3d 534, 548 (11th Cir. 2011).  Due process requires that

15

aliens receive a full and fair hearing. *Id.* To establish a due process violation, the alien must show that he or she was "deprived of liberty without due process of law and that the purported errors caused [him or] her substantial prejudice." *Id.* To show substantial prejudice, the alien must establish that the outcome of the proceeding would have been different but for the alleged errors. *Id.* However, a failure to receive purely discretionary relief does not amount to a deprivation of a liberty interest. *Id*.

The Federal Rules of Evidence do not apply in immigration proceedings. *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1299 (11th Cir. 2015). Generally speaking, the IJ must consider all of the evidence the alien presents. *Forgue*, 401 F.3d at 1287. On the other hand, IJs have discretion to exclude evidence submitted after a court-ordered filing deadline. *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1276 (11th Cir. 2009). If an applicant fails to file a document prior to the deadline, he or she waives the opportunity to do so and does not have a constitutionally protected liberty interest in the admission of the document. *Id.*; *see also* 8 C.F.R. § 1003.31(c). Thus, an applicant may not establish a due process violation based on the IJ's decision to exclude untimely filed documents. *Tang*, 578 F.3d at 1276.

El-Abaidy has failed to establish that the IJ's exclusion of Dr. Atiya's psychological examination, the results of his polygraph examination, and his bankruptcy attorney's testimony violated his due process rights. By filing the

polygraph results and psychological evaluation more than two months after the court-imposed deadline, El-Abaidy waived his opportunity to submit them. He could not establish that the exclusion of his bankruptcy attorney's testimony caused him substantial prejudice because his financial problems were not at issue.

PETITION DENIED.