[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13696
Non-Argument Calendar
_____

Agency No. A088-394-529

TUNG VAN DINH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(June 29, 2015)

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Tung Van Dinh, a Vietnamese citizen, seeks review of the Board of Immigration Appeals's ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and withholding of removal under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Dinh argues that he is eligible for asylum because he suffered past persecution and has a well-founded fear that he will be singled out for future persecution on account of a political opinion—his belief that the Vietnamese government should return land that was confiscated from the Catholic Church without due process.[1] He also contends that the interpreter's mistranslations during the merits hearing violated his due-process rights. After careful review, we affirm.

## I.

Dinh, a native and citizen of Vietnam, and his wife and son were admitted as non-immigrant visitors to the United States on August 5, 2009. They had authorization to remain in the United States until February 4, 2010.

On January 19, 2010, Dinh filed an application for asylum and withholding of removal, which he later amended.[2] On February 25, 2010, the Department of Homeland Security served Dinh with a Notice to Appear, charging him as

---

[1] Dinh does not raise any arguments on appeal with respect to the denial of his claims for withholding of removal and CAT relief. Therefore, we address only the asylum issue.

[2] Dinh's wife and son were listed as derivative beneficiaries on Dinh's asylum application and were co-respondents in the agency removal proceedings.

removable under 8 U.S.C. § 1227(a)(1)(B) for having remained in the United States for a longer time than permitted. At the master calendar hearing, Dinh conceded removability and requested CAT relief in addition to asylum and withholding of removal. Dinh filed a supplemental application for asylum, withholding of removal, and CAT relief on December 28, 2011.

Dinh primarily sought asylum relief based on what he described as his political opinion that the Vietnamese government should return land that was confiscated from the Catholic Church after 1975.[3] He claimed that he feared torture, harm, or mistreatment if he returned to Vietnam. The following summary of facts is taken from Dinh's original and supplemental applications for asylum and attached statements, in conjunction with Dinh's testimony at the hearing before the IJ.

Dinh's father was a police officer employed by the United States-backed government in Saigon (now Ho Chi Minh City) until the Communists took over South Vietnam in 1975. After the regime change, Dinh's father was arrested, imprisoned, and beaten. The government confiscated their house, and his family was forced to relocate and to make a difficult living off the land. Dinh's brother fled to the United States by boat. Dinh alleged that the Communists beat and

---

[3] Dinh also sought asylum based on his religion, Buddhism, but there is no evidence of religious persecution in the record, and Dinh does not argue this ground on appeal.

3

tortured him and his family during this time.  His siblings were prevented from attending college because they were not from a Communist family.

In 1986, Vietnam underwent economic reforms.  Dinh was able to attend college.  He chose to work in tourism because he thought that his job would have nothing to do with politics.  He earned degrees in management, English, and tourism.  Dinh eventually became the director of a tourism company owned by the Vietnamese government.  The company managed tourist resorts in Vietnam, among other things.  As director, he was able to afford a house and car and to take care of his family.  He made around twenty-five to thirty times more than what the average Vietnamese citizen made.

Over time, Dinh realized that the company was not a "legitimate" business and was being controlled by the government to benefit members of the Communist party.  For example, Dinh alleged that he had evidence that his supervisor organized a tour to the United States in 2009 for the purpose of laundering money.  In addition, Dinh stated that when a child died in a swimming pool at one of the company's resorts in 2008, he, as director, was held liable and risked incarceration and had to pay civil damages out of pocket.  Dinh alleged that the legal system was corrupt and that he was in danger of being incarcerated without a trial because he was not a Communist party member and could not be trusted, given his father's previous association with the democratic government of South Vietnam.

4

In 2007, Dinh discovered that his company operated a tourist resort on land that had been confiscated from the Catholic Church after the Communists took over in 1975. The land was worth around $200 million. Dinh believed that the confiscation was wrong and that the land should be returned to the Church. On numerous occasions, Dinh raised the issue of the wrongful appropriation of the land with his supervisor, Nzuyen Hoanz Bien,[4] a high-ranking official in the department of labor. Dinh also was asked by the Catholic Church to speak on its behalf, but the government threatened him not to help the Church.

Dinh was told not to discuss the land confiscation issue with anyone else. On one occasion after Dinh voiced his complaints regarding the land, Nzuyen responded, "Do you want to die? If we return the land to the Church, how could we make money? How could we survive?" Dinh believed that if he told anyone else about the land he would be imprisoned or killed. According to Dinh, anyone who asked the government to return the Vatican's land was imprisoned, including Hing When Lee, a pastor. Other religious leaders who protested the confiscation of land owned by churches were also imprisoned. Furthermore, Dinh said that his lawyer in Vietnam was imprisoned for opposing the government around this same time.

---

[4] Nzuyen's name may have been inaccurately transcribed or translated, as Dinh suggests, and is actually "Nguyen." Nonetheless, we refer to Dinh's supervisor as "Nzuyen" for consistency with the administrative record.

5

Dinh left Vietnam with his family in 2009 because he feared being imprisoned or killed if he continued to speak out about the land issue. By the time Dinh left, his company wanted him and his family to go because he "became a thorn." He resigned from the company upon leaving the country. After he left Vietnam, Dinh's house was confiscated, and he may have been labeled a dissident.

In response to questions from the IJ, Dinh clarified that he did not report anything regarding the confiscated land to anyone besides his friends and Nzuyen while he lived in Vietnam, and that Nzuyen was the only person who ever said anything threatening to him regarding the land. Dinh also testified that he was not a member of a political party and did not participate in anti-communist demonstrations, which were forbidden in Vietnam.

When the IJ asked if Dinh had ever been physically harmed in Vietnam, Dinh replied, "I became openly against them just before I left so they did not have time to harm me physically" and said that he was "only threatened." He had been beaten and kicked by police when he was a child and in high school, but after 1993, no one in the Communist regime physically harmed him, though the government "made a lot of verbal threats and . . . supervise[d] [him]." For example, Dinh had to write reports on his activities every year.

Dinh included several documents with his application, including a 2012 Country Report on Human Rights Practices prepared by the United States

6

Department of State.  According to the Country Report, land-rights protestors alleging that the government confiscated their land without proper compensation reported physical harassment and intimidation by local authorities.  Arbitrary arrests and detention continued to be a problem, particularly for political activists. While Vietnamese law provided criminal penalties for government corruption, corruption was still a major problem.  Dinh also attached what appears to be a 2009 news article from an unknown source stating that lawyer Le Cong Dinh and other Vietnamese citizens were imprisoned for political activism.  Dinh asserts that Le Cong Dinh was his lawyer who was arrested.

The IJ denied Dinh's application for asylum, withholding of removal, and CAT relief.  The IJ did not enter an adverse credibility finding, but noted that he did not believe everything Dinh had said, highlighting that Dinh's theory of persecution had shifted over the course of his filings and the hearing.  Specifically, the IJ noted that Dinh had not emphasized the wrongful-confiscation issue in his written applications, but that it became the central issue at the hearing.

The IJ found that Dinh had not demonstrated past persecution.  In explaining his conclusion, the IJ noted that Dinh had not been physically beaten for more than 20 years before he applied for asylum.  In addition, the IJ found, Dinh had risen to a high-level job in his company, had traveled extensively, and had earned a high income.

The IJ also determined that Dinh failed to demonstrate a well-founded fear of future persecution. Dinh's testimony was the only evidence that his boss had ever threatened him, which the Judge concluded was insufficient to meet Dinh's burden of proving an objectively reasonable fear of future persecution.

Finally, the IJ concluded that there was an insufficient nexus between any persecution and a protected ground. The IJ found that it was not clear "what the real nexus in this case is," and that Dinh had failed to show that his opposition to the Vietnamese government's confiscation of the land constituted an expression of political opinion, citing the BIA's opinion in *Matter of N–M–*, 25 I. & N. Dec. 526 (BIA 2011).[5] Consequently, the IJ denied Dinh's application for asylum, withholding of removal, and CAT relief.

Dinh appealed the IJ's decision to the BIA. The BIA affirmed the IJ's decision "for the reasons stated therein" and wrote separately only to address Dinh's arguments on appeal. Among other things, the BIA concluded that (1) the IJ was required to consider all the evidence in the record and therefore did not err in noting a shift in the theory of persecution between Dinh's testimony at the

---

[5] In *Matter of N–M–*, the BIA concluded that, in some circumstances, opposition to official corruption can constitute political opinion or imputed political opinion. 25 I. & N. Dec. at 528. According to the BIA, activities such as "founding or being active in a political party that opposes state corruption," attending or speaking at political rallies against state corruption, writing or distributing materials about state corruption, or threatening to expose corruption to others could constitute the expression of a political opinion or may lead the persecutor to impute such an opinion to the asylum applicant. *Id.* & n.1.

hearing and his prior statements in the asylum applications;  (2) while Dinh argued that the IJ improperly required evidence of physical harm, Dinh did not challenge the finding that nothing happened to him during his time living under the Communist regime;  (3) as a matter of law, Dinh must show more than a fear of retaliation based solely on his opposition to the wrongful confiscation of the land, and Dinh's opposition did not constitute an actual political opinion;  and (4) Dinh failed to show that the alleged translation problems caused the IJ to misunderstand the nature of his claim or its factual basis.  The BIA dismissed Dinh's appeal. Dinh now brings this petition for review.

## II.

Normally, we review only the BIA's decision.  *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001).  But because the BIA's decision expressly adopted the IJ's decision "for the reasons stated therein," we review the IJ's decision as well.  *Id.*

We review administrative factual determinations under the "highly deferential substantial evidence test."  *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (*en banc*).  We view the record and draw all reasonable inferences in favor of the administrative agency's decision.  *Id.* at 1027.  "We must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Id.* (internal quotation

marks omitted).   To reverse a factual finding, we must find that the evidence compels a contrary conclusion.  *Id.*  "[E]ven if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision."  *Id.* at 1029.

We review constitutional challenges regarding removal proceedings *de novo. Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1143 (11th Cir. 2010).

## III.

Dinh argues the BIA erred in adopting the IJ's decision because he presented sufficient evidence of past persecution, a well-founded fear of future persecution, and a nexus between such persecution and his political opinion.

To be eligible for asylum, an applicant must be a "refugee."   8 U.S.C. § 1158(b)(1)(A).  A "refugee" is defined as follows:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).  The applicant bears the burden of proving that he is a refugee.  8 U.S.C. § 1158(b)(1)(B)(i).  To make this showing, the applicant must present specific and credible evidence demonstrating that he (1) was persecuted in the past based on one of the protected grounds, or (2) has a well-founded fear that

10

he will be persecuted in the future based on one of the protected grounds. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006). The protected ground must be "at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i).

Demonstrating past persecution creates a rebuttable presumption that the applicant has a well-founded fear of future persecution. *Ruiz*, 440 F.3d at 1257. If the applicant cannot show past persecution, the applicant must show a "well-founded fear of future persecution that is both subjectively genuine and objectively reasonable." *Id.* An applicant's credible testimony that he fears persecution generally satisfies the subjective component. *Id.* To satisfy the objective component, the applicant must either show past persecution or present specific, detailed facts showing a good reason to fear that he will be singled out for future persecution. *Al Najjar*, 257 F.3d at 1289-90.

"[P]ersecution is an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation[.]" *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1308 (11th Cir. 2013) (internal quotation marks omitted). The IJ must consider the cumulative effect of any alleged incidents to determine whether an alien suffered past persecution. *Id.* A single death threat is generally insufficient to qualify as persecution. *See Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1237 (11th Cir. 2006) (concluding that a "condolence note" containing an implicit death threat was "an example of harassment and intimidation, but not

11

persecution").   Minor physical abuse and brief detentions also do not amount to persecution.   *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009).   However, serious physical injury is not required if the applicant also shows repeated threats combined with other forms of severe mistreatment.   *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1009 (11th Cir. 2008).

Assuming *arguendo* that Dinh's belief that the Catholic Church's land was unlawfully taken without due process and should be returned constituted a political opinion, and therefore a protected ground for purposes of asylum, Dinh still has not shown that there was no reasonable basis for the denial of Dinh's application for asylum.   *See Adefemi*, 386 F.3d at 1029.

First, substantial evidence supports the determination that Dinh did not suffer past persecution.   The record shows that, when Dinh was young, Dinh's father was arrested, imprisoned, and beaten for working for the United States-backed government in South Vietnam.   Because of this, Dinh and his family suffered beatings and severe economic deprivations.   However, there is no evidence that any persecution Dinh experienced when he was younger was tied to Dinh personally or was on account of Dinh's political opinion.   *See Rodriguez*, 735 F.3d at 1309 ("The pattern of persecution must be 'tied to the applicant personally.'") (quoting *In re A–K–*, 24 I. & N. Dec. 275, 278 (BIA 2007)); *Ruiz*, 440 F.3d at 1257.

12

Dinh's testimony at the hearing was that, since 1993, he had not suffered any physical harm from the police or the government. Indeed, as an adult, he became a highly paid government employee who lived comfortably. The "crux" of Dinh's asylum claim, as he puts it, was Dinh's opposition to the wrongful confiscation of the Catholic Church's land and the resulting threats he received from his supervisor. But the only specific threat Dinh testified about was a single ambiguous death threat, which alone is insufficient to show more than harassment or intimidation. *See Silva*, 448 F.3d at 1237. And while Dinh's testimony also generally indicates that he received other threats from Nzuyen not to speak out about the land, the record does not compel the finding that these incidents were "severe" or "extreme" enough to amount to persecution. *See Kazemzadeh*, 577 F.3d at 1353; *De Santamaria*, 525 F.3d at 1009.

Substantial evidence likewise supports the finding that Dinh did not have an objectively reasonable and well-founded fear of future persecution. Dinh testified that he first learned of the land confiscation in 2007, and that, from that point until he left Vietnam in 2009, he raised the issue with his supervisor, Nzuyen, on numerous occasions. However, during this same time, Dinh continued to work as a highly paid government employee, and he traveled to and from the United States. The only specific threat Dinh testified about was an ambiguous death threat from

13

his supervisor. Such isolated intimidation does not compel a finding that Dinh's fear of being singled out for future persecution was objectively reasonable.

While Dinh's criticism of the Vietnamese government, viewed in light of evidence of Vietnam's practice of incarcerating political and land-rights activists, weighs in favor of a finding that Dinh had an objectively reasonable fear of persecution if he returned to Vietnam, it does not compel such a finding because the record supports the IJ's and BIA's determinations that Dinh was not a political activist, was not Catholic, and was not directly or overtly opposed to Communism. Thus, the record does not compel a finding that Dinh had good reason to fear that he will be singled out for future persecution. *See Al Najjar*, 257 F.3d at 1289-90.

In short, substantial evidence supports the decision that Dinh did not establish past persecution or a well-founded fear of future persecution. *See Adefemi*, 386 F.3d at 1026-29. Therefore, we do not address Dinh's remaining arguments that he established a sufficient nexus between his political opinion and the threat of future persecution.

## IV.

Dinh also argues that his due-process rights to a fair hearing were violated because he was deprived of a suitable interpreter. According to Dinh, the interpreter's deficiencies caused the IJ to believe that there were discrepancies in Dinh's testimony that did not, in fact, exist.

We briefly review the some of the translation issues during the hearing. At one point, Dinh's attorney interrupted the hearing to express his concern that Dinh's testimony was being summarized by the interpreter. The IJ instructed Dinh to only speak one sentence at a time so his testimony could be translated. He also directed Dinh's attorney, who spoke Vietnamese, to object to the translations if there were any further problems. On another occasion, when Dinh was explaining whether he reported the land issue to anyone apart from his supervisor, Dinh's attorney suggested that the interpreter did not fully understand the vocabulary Dinh was using. The interpreter stated that there was no vocabulary issue and that she noticed that some of Dinh's answer was not relevant to the question asked. The IJ instructed the interpreter to repeat whatever Dinh said regardless of its relevance. Thereafter, Dinh stated that he could not understand some of the interpreter's translations. After some further discussion, the IJ determined that the interpreter was translating correctly and that the hearing should proceed.

The Fifth Amendment entitles petitioners in removal proceedings to due process of law, which requires that petitioners "be given notice and an opportunity to be heard in their removal proceedings." *Lapaix*, 605 F.3d at 1143; *see Alhuay v. U.S. Att'y Gen.*, 661 F.3d 534, 548 (11th Cir. 2011) (reviewing a due process claim based in part on the lack of an interpreter). To obtain relief based on a due-process violation, the petitioner must show both (1) violation of due process and (2)

substantial prejudice.  *Lapaix*, 605 F.3d at 1143.  To show substantial prejudice, the petitioner "must demonstrate that, in the absence of the alleged violations, the outcome of the proceeding would have been different." *Id.*

Here, even if the interpreter mistranslated portions of Dinh's testimony or made it more difficult to understand, Dinh fails to show that any errors caused him substantial prejudice.  While many of the translations contained grammatical errors, the thrust of Dinh's testimony was comprehensible.  Dinh and his attorney both spoke English and Vietnamese, and the record shows that translation issues did not cause the IJ to misunderstand the factual basis of Dinh's asylum claim. The IJ's summary of Dinh's testimony is consistent with the remainder of the record and with Dinh's presentation of the evidence on appeal.

We disagree with Dinh's contention that the translation issues caused the IJ to believe there were discrepancies in his testimony.  First, the IJ did not make an adverse credibility finding.  Second, the IJ's discussion of issues related to Dinh's credibility focused on the differences between the theories of persecution asserted in Dinh's written materials and the theory of persecution relied upon at the hearing, not on any inconsistencies in his testimony at the hearing.  Therefore, Dinh has not shown that, in the absence of the alleged violations, the result would have been different. *See Lapaix*, 605 F.3d at 1143.

## V.

16

In sum, we conclude that substantial evidence supports the agency's decision that Dinh did not suffer past persecution or have a well-founded fear of future persecution. Furthermore, Dinh was not prejudiced by any violations of his due-process rights during the merits hearing. Accordingly, we deny Dinh's petition for review.

**PETITION DENIED.**