[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13201
Non-Argument Calendar

_____

Agency No. A216-602-361

JORGE ALBERTO MARTINEZ RIVERA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 8, 2021)

Before MARTIN, BRANCH, and GRANT, Circuit Judges.

BRANCH, Circuit Judge:

Jorge Alberto Martinez Rivera, a native and citizen of Honduras, seeks review of the Board of Immigration Appeals' ("BIA") order affirming the Immigration Judge's ("IJ") denial of his application for cancellation of removal.[1] He argues that the IJ lacked jurisdiction over his removal proceedings under *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), because the Notice to Appear ("NTA") did not include the time and date of his removal hearing. Alternatively, he argues that he was denied due process because the BIA failed to give reasoned consideration to the exceptional and extremely unusual hardship his U.S. citizen children would suffer upon his removal and because the IJ demonstrated bias at the removal hearing. We address each claim in turn.

## I.    Background

On April 23, 2018, the Department of Homeland Security ("DHS") served Martinez Rivera with an NTA that charged him with being removable as an alien present in the United States who was not admitted or paroled. The NTA did not

---

[1] The Attorney General may cancel the removal of an inadmissible or removable alien and adjust the status of the alien to that of a lawful permanent resident if the alien:

> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;
> (B) has been a person of good moral character during such period;
> (C) has not been convicted of [certain specified offenses]; and
> (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1229b(b)(1).

2

specify the date, location, or time of the removal hearing. A few days later, the immigration court mailed Martinez Rivera a notice of hearing with the time, date, and location of the hearing. Thereafter, Martinez Rivera filed a motion to terminate the removal proceedings, arguing that the immigration court lacked jurisdiction over the removal proceedings under *Pereira* because the NTA was deficient as it did not include the date, time, and location of the removal hearing. The IJ denied the motion, concluding that (1) *Pereira* was limited to the effect of a deficient NTA on the "stop-time rule" for purposes of cancellation of removal, (2) a defective NTA does not deprive the immigration court of jurisdiction, and (3) regardless, the subsequent notice of hearing cured any defect in the NTA.

At the removal hearing, Martinez Rivera admitted the allegations in the NTA and conceded removability. The IJ then addressed Martinez Rivera's application for cancellation of removal, in which he asserted that his removal would cause exceptional hardship to his United States citizen children. Martinez Rivera confirmed that two of his children were United States citizens,[2] and they lived with him and his partner, who was "a housewife." The IJ asked Martinez Rivera why his children were not reported in any of his tax returns, and Martinez Rivera explained that his partner included them on her taxes. When questioned as to what income his partner has if she is a housewife, Martinez Rivera explained

---

[2] Martinez Rivera has a third child who is a native and citizen of Honduras.

3

that "she takes care of children and sometimes she cleans houses when the opportunity arises." Martinez Rivera stated that he worked for a construction company and confirmed that he did not provide any documentation to obtain employment. He earned about $40,000 annually at his job. The IJ noted that, according to the application for cancellation of removal, Martinez Rivera's children received food stamps and Medicaid, and the IJ questioned Martinez Rivera's counsel as to how they could qualify for those benefits given Martinez Rivera's income. Counsel stated that she had not "check[ed] into that," but it was her understanding that Martinez Rivera's partner was responsible for "signing up the kids" for those benefits. The IJ expressed concern that the benefits were obtained because Martinez Rivera's income was not included, which would be welfare fraud, and that would bear on the issue of good moral character—one of the criteria for cancellation of removal for which Martinez Rivera had the burden of proof. The IJ indicated that Martinez Rivera's counsel should have looked into the issue.

Turning back to Martinez Rivera's taxes, the IJ questioned his $5,000 deduction for car expenses in light of Martinez Rivera's statement at the hearing that he did not drive his car to work. Martinez Rivera confirmed that they used the car to "buy[] food and [run] errands and all that. There's a vehicle in the house, I don't drive it[,] but it's used for running errands and buying food and taking the

4

children to doctor's appointments and all that.  I don't drive it and it's not in my name."  The IJ explained that those expenses could not be deducted because they were not related to Martinez Rivera's employment.

Martinez Rivera explained that, if removed, his children would have to come with him because his partner did not have any legal status in the United States, and she "would not be able to cover the expenses, the rent, and so on."[3]  Martinez Rivera explained that his partner did not attend the hearing because she was home with the children.

Martinez Rivera confirmed that other than a hernia he was in good health and capable of working.  He explained that his partner could not work in the United States because "[s]he doesn't have documentation to get a job," and there are no jobs for women in Honduras.  He confirmed that his eight-year-old daughter was in good health and that his two-and-a-half year old son was physically in good health, but "doesn't speak" and was currently receiving speech therapy for that issue.  Martinez Rivera stated that his son's need for speech therapy would be ongoing, but he did not have any documentation demonstrating that speech therapy was not available in Honduras.  He explained that his daughter could speak in

---

[3]  This statement differed from Martinez Rivera's assertion in his application for cancellation of removal that his children would not go with him if he was removed because "their future is here in the United States.  They are safer and happier here.  I would not want to take away their future."

English and Spanish but she could only write in English, and she was currently enrolled in a program in school to help her with her English and writing.

Martinez Rivera elaborated on his daughter's health, stating that "when she was about eight or nine months, she had to be hospitalized" for "respiratory problems." However, she "ha[d] improved a lot," was well now, and had not been "gravely ill" like before. He explained that she has not been hospitalized since then, but that was "because the doctor told us not to allow anything to get to that point, get worse, to take her quickly and not do what we did when she was little." He confirmed that his daughter did not take any medications, unless she gets a cold, and when she does get sick, they "take her to the doctor immediately so she can have medication and not go through a relapse." Martinez Rivera explained that in Honduras when people get sick "[y]ou have to go find a doctor or a health center on your own." He stated that he was "very concerned" about his children's safety and "studies" if they returned to Honduras with him, but he confirmed that his sisters who live in Honduras have children there.

On cross-examination, Martinez Rivera confirmed that he had worked in the United States since 2004, but he had only submitted tax returns for three years. And in those returns he had claimed dependents that he should not have, and, as a result, he owed the IRS $12,387. He was on an installment repayment plan with the IRS. Finally, the IJ inquired into the government's position on voluntary

6

departure—which the government had no objection to—but Martinez Rivera's counsel stated that he was not requesting voluntary departure.

The IJ determined that Martinez Rivera lacked good moral character—citing the inconsistently filed tax returns, improperly claimed dependents on tax returns, and his children's receipt of certain entitlement benefits based on just his partner's income—but the IJ stated that he would not deny cancellation of removal for that reason. Instead, the IJ determined that Martinez Rivera failed to establish that his removal would result in an exceptional and extremely unusual hardship to his children. The IJ explained that, although Martinez Rivera's daughter was very sick as an infant, there had not been any issues since then, and he failed to show that medical treatment was unavailable in Honduras. Similarly, although Martinez Rivera's son was receiving speech therapy, medical documentation submitted revealed that "his scores are all average with the strongest domain being social skills, again, he's only two-and-a-half." The IJ further noted that Martinez Rivera had not brought his partner to the hearing or any documentation from her, and without any information from her it was "entirely unclear" whether the children would go with Martinez Rivera to Honduras. Thus, the IJ determined that, given the totality of the circumstances, Martinez Rivera failed to show that his two United States citizen children "would suffer hardship substantially beyond that which would ordinarily result from an alien's removal." The IJ explained that

7

"[d]iminished educational standards and opportunities, lower standard of living, poor economic conditions and other adverse country conditions in the country [of] removal" are alone insufficient "to support a finding of exceptional extremely unusual hardship." Accordingly, the IJ denied his application for cancellation of removal, and ordered him removed to Honduras.

Martinez Rivera, through counsel, appealed to the BIA, arguing that (1) the IJ erred in finding that Martinez Rivera lacked good moral character; (2) the IJ erred in determining that exceptional and extremely unusual hardship did not exist based on the facts of his case; (3) the NTA was defective and deprived the immigration court of jurisdiction under *Pereira*; and (4) the IJ demonstrated bias against Martinez Rivera.[4]

The BIA dismissed his appeal. The BIA determined that defects in the NTA did not deprive the immigration court of jurisdiction, citing *Matter of Bermudez-Cota*, 27 I. & N. Dec. 441 (BIA 2018), and *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148 (11th Cir. 2019). The BIA affirmed the IJ's determination that Martinez

---

[4] Martinez Rivera asserted that the IJ demonstrated bias when (A) he *sua sponte* ordered alternatives to detention as a condition of Martinez Rivera's bond prior to the removal hearing, which resulted in him having to wear an ankle monitor for approximately nine months (despite having no criminal history) and caused him to miss work to address home visits and having to physically report to Atlanta from Carrollton, Georgia; (B) left the merits hearing on the detained docket, even after Martinez Rivera's release from detention, which expedited the removal hearing and caused him and his counsel to have to prepare for the hearing in just a two-month time frame; and (C) initially ordering voluntary departure following the removal hearing without first consulting with Martinez Rivera or his counsel.

Rivera failed to demonstrate that his removal would result in exceptional and

extremely unusual hardship to his children, stating as follows:

> On appeal, the respondent argues he established the requisite hardship to his qualifying relatives (Respondent's Br.at 8–9). We affirm the Immigration Judge's decision. We agree with the Immigration Judge that the respondent did not demonstrate his removal would result in exceptional and extremely unusual hardship to his qualifying relatives, which includes his two United States citizen children, ages 8, and 2, at the time of the hearing (IJ at 2–4). *See Matter of J-J-G-*, 27 I&N Dec. 808, 813–15 (BIA 2020); *Matter of Andazola*, 23 I&N Dec. 319, 323 (BIA 2002) (discussing exceptional and extremely unusual hardship standard); *Matter of Monreal*, 23 I&N Dec. 56, 60–63 (BIA 2001); *cf. Matter of Recinas*, 23 I&N Dec. 467, 470–72 (BIA 2002).

> We agree with the Immigration Judge's decision that the respondent has not established that any of his children suffer from serious ongoing medical issues or compelling special needs in school which rise to the level of exceptional and extremely unusual hardship (Respondent's Br. at 4,9; IJ at 2-3; Tr. at 16,18-22,24). *See Matter of Monreal*, 23 I&N Dec.at 63 (very serious health issues or compelling special needs in school may form a basis for grant of cancellation).

> The respondent testified that his children and domestic partner will accompany him to Honduras (IJ at 3; Tr. at 13; Exh. 4, Part 6 at #44). While we recognize that by accompanying him to Honduras, his two United States citizen children will be separated from friends and family in the United States and may have fewer educational and economic opportunities, we agree with the Immigration Judge that the respondent has not established his children would suffer hardship substantially beyond that which ordinarily would be expected to result from a family member's removal from the United States. *See Matter of Andazola*, 23 I&N Dec. at 321–24 (poor economic conditions and diminished educational opportunities in Mexico did not result in exceptional and extremely unusual hardship to two United States citizen children of single mother). The respondent's father and siblings live in Honduras, and may be able to assist them in the relocation process (IJ at 3; Tr. at 25-26).

The respondent is young, healthy, and has not established he would be unable to provide some financial support for his children in Honduras.  Accordingly, considering the totality of the circumstances presented, we are not persuaded the respondent has established that, upon his removal, his qualifying relatives would suffer exceptional and extremely unusual hardship as a result of his removal from the United States.  *See Matter of Monreal*, 23 I&N Dec. at 323.  As the issue of exceptional and extremely unusual hardship is dispositive, we need not address the Immigration Judge's good moral character determinations.  Hence, the respondent has not met his burden of proof to establish eligibility for cancellation of removal.

The BIA construed Martinez Rivera's claim of IJ bias as a due process claim and concluded that he had not shown any prejudice and that he had received a full and fair hearing.  Finally, the BIA explained that it lacked the authority to address any challenge to Martinez Rivera's custody status determination.  We now turn to the claims raised in Martinez Rivera's petition for review.

## II.    Discussion

We review only the decision of the BIA, except to the extent that it adopts the IJ's decision or expressly agrees with the IJ's reasoning.  *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016).  When the BIA explicitly agrees with the findings of the IJ, we will review the decisions of both the BIA and the IJ as to those issues.  *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010).  We

10

review legal questions *de novo*. *Poveda v. U.S. Att'y Gen.*, 692 F.3d 1168, 1172 (11th Cir. 2012).

### A. Whether the immigration court lacked jurisdiction over Martinez Rivera's removal proceeding based on the defective NTA

Martinez Rivera argues that the NTA was statutorily deficient because it failed to designate the specific time or place of removal proceedings and thus, pursuant to *Pereira*, it was not a "notice to appear" under 8 U.S.C. § 1229(a) and did not vest the immigration court with jurisdiction. He maintains that the BIA's determination that the subsequent notice of hearing vested jurisdiction in the agency under its decision in *Matter of Bermudez-Cota* contradicts our decision in *Perez-Sanchez* because the agency cannot self-impose jurisdictional rules.

The Immigration and Nationality Act provides that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). An individual in removal proceedings must be provided with an NTA specifying, among other things, the time and place of the removal hearing. *Id.* § 1229(a)(1)(G)(i).

In *Pereira*, the Supreme Court held that an NTA that does not specify the time and place of the initial removal proceeding does not qualify as a "notice to appear under section 1229(a)" and therefore does not trigger the stop-time rule for purposes of cancellation of removal. 138 S. Ct. at 2110, 2116. In so holding, the

11

Supreme Court explained that it was deciding only a "narrow question" about an eligibility requirement for cancellation of removal. *Id.* at 2110.

In *Perez-Sanchez v. United States Attorney General*, 935 F.3d 1148, 1150 (11th Cir. 2019), we addressed a petitioner's claim that, in light of *Pereira*, the IJ never had jurisdiction over his removal proceeding because the NTA did not include the time or date of his removal hearing. We held that the defective NTA did not deprive the agency of jurisdiction over the removal proceedings because § 1229(a)'s "time-and-place requirement" did not "create a jurisdictional rule," but was instead a "claim-processing rule." *Id.* at 1154–55. Similarly, we concluded that 8 C.F.R. § 1003.14—which provides that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document[,]" such as an NTA, "is filed with the Immigration Court"—"set[] forth not a jurisdictional rule but a claim-processing one." *Id.* at 1155. We explained that in § 1229a(a)(1), Congress "empower[ed] IJs to 'conduct proceedings for deciding the inadmissibility or deportability of an alien,'" which was a "broad grant of authority" that was "not limited in any way by the filing or service of an NTA." *Id.* at 1156. We emphasized that only Congress can define the scope of an agency's authority; therefore, "an agency cannot fashion a procedural rule to limit jurisdiction bestowed upon it by Congress." *Id.* at 1155.

12

Accordingly, Martinez Rivera's claim that the immigration court lacked jurisdiction over his removal proceedings because the NTA failed to specify the time and place of his removal proceedings is foreclosed by our decision in *Perez-Sanchez*.[5]

### B. Whether the BIA gave reasoned consideration to Martinez Rivera's arguments concerning the exceptional and extremely unusual hardship requirement

Martinez Rivera argues that the BIA violated his due process rights when it failed to give reasoned consideration to his arguments that his removal would cause exceptional and extremely unusual hardship to his U.S. citizen children because it "gave no credence to some evidence in the record and misstated some contents of the record" and it "glossed over" his children's medical needs that were reflected in his testimony and submitted supporting documents. He maintains that "[h]ad the BIA given reasoned consideration to [the] evidence, it might have found that in the totality, [he] established extreme and exceptionally unusual hardship."[6]

"We review claims of legal error . . . including claims that the BIA did not provide reasoned consideration of its decision, *de novo*." *Bing Quan Lin v. U.S.*

---

[5] To the extent Martinez Rivera claims that the defective NTA violated the agency's claim-processing rules, we lack jurisdiction "because he failed to exhaust the claim before the agency." *Perez-Sanchez*, 935 F.3d at 1157.

[6] The government argues that we lack jurisdiction to review this claim because 8 U.S.C. § 1252(a)(2)(B)(i) precludes our review of "any judgment regarding the granting of relief under . . . [8 U.S.C. §] 1229b"—including cancellation of removal—except to the extent that such review involves "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(B), (D).

*Att'y Gen.*, 881 F.3d 860, 872 (11th Cir. 2018).  To provide adequate reasoned consideration, the BIA "does not need to do much."  *Ali v. U.S. Att'y Gen.*, 931 F.3d 1327, 1333 (11th Cir. 2019).  Rather, "[w]e just need to be left with the conviction that the [BIA] has heard and thought about the case and not merely reacted."  *Id.* (alterations in original adopted) (quotation omitted).  In assessing whether the BIA provided reasoned consideration, we determine whether its reasoning "can be reviewed for error."  *Bing Quan Lin*, 881 F.3d at 874.  Thus, "[a]lthough it is true that the IJ and the BIA must consider all the evidence submitted, it is well established that the IJ and the BIA need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented."  *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1302 (11th Cir. 2015) (quotation omitted).

We have found a lack of reasoned consideration in three types of circumstances—when the BIA: (1) "misstates the contents of the record," (2) "fails to adequately explain its rejection of logical conclusions," or (3) "provides justifications for its decision which are unreasonable and which do not respond to any arguments in the record."  *Ali*, 931 F.3d at 1334 (quotation omitted).  Thus, all

---

A claim, however, "that the agency failed to give reasoned consideration to an issue is a question of law."  *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 799 (11th Cir. 2016).  Thus, a reasoned consideration claim does not fall within the jurisdiction-stripping language of § 1252(a)(2)(B).

three circumstances "share a common trait: The [BIA's] opinion, read alongside the evidentiary record, forces us to doubt whether we and the [BIA] are, in substance, looking at the same case." *Id.* "Where the BIA has not given 'reasoned consideration' of a question or made 'adequate findings,' we remand for further proceedings." *Bing Quan Lin*, 881 F.3d at 874.

In this case, the BIA's decision clearly provided reasoned consideration to Martinez Rivera's claim that his removal would cause exceptional and extremely unusual hardship to his U.S. citizen children. In his brief to the BIA, Martinez Rivera argued that both of his U.S. citizen children "have medical and/or educational issues" which would elevate their hardship if they had to move to Honduras, particularly in light of the fact that there were no relatives in Honduras that could assist the family with the transition. In affirming the IJ's determination that Martinez Rivera failed to demonstrate "exceptional and extremely unusual hardship," the BIA cited its own case law recognizing that serious health conditions or special needs in school may be a basis for cancellation of removal. Nevertheless, the BIA explained that it "agree[d] with the [IJ's] decision that the respondent has not established that any of his children suffer from serious ongoing medical issues or compelling special needs in school which rise to the level of exceptional and extremely unusual hardship." And the IJ's decision acknowledged Martinez Rivera's testimony concerning his daughter's respiratory problems and

15

his son's speech problems and ongoing therapy, but the IJ noted that Martinez

Rivera's daughter had not been sick since she was a newborn, that his son's

evaluation scores were "all average," and that there was no evidence that medical

treatment is unavailable in Honduras.[7]  Thus, although Martinez Rivera may

disagree with the IJ's and the BIA's determination, it is clear from the record "that

the [BIA] . . . heard and thought about the case and [did] not merely react[]."[8]  *Ali*,

931 F.3d at 1333 (alterations in original adopted) (quotation omitted).  In other

words, this is simply not an opinion that "read alongside the evidentiary record,

forces us to doubt whether we and the [BIA] are, in substance, looking at the same

case."  *Id.* at 1334.

---

[7]  Because the BIA expressly agreed with the IJ's reasoning, we review the decisions of both the BIA and the IJ.  *Ayala*, 605 F.3d at 948.

[8]  To the extent that Martinez Rivera suggests that the IJ and BIA improperly weighed the evidence in his case when determining whether he met the exceptional and extremely unusual hardship requirement for cancellation of removal, we lack jurisdiction over such a claim.  *See* 8 U.S.C. § 1252(a)(2)(B)(i); *see also Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1274, 1277–78, 1283 (11th Cir. 2020) (*en banc*) (explaining that "§ 1252(a)(2)(B)(i) precludes us from reviewing 'whatever kind' of judgment 'relating to' the granting of relief under the five enumerated sections"); *Fynn v. U.S. Att'y Gen.*, 752 F.3d 1250, 1252 (11th Cir. 2014) ("Argument that the IJ or BIA abused its discretion by improperly weighing evidence is a 'garden-variety abuse of discretion argument' that is insufficient to state a legal or constitutional claim." (quotation omitted)).  As the Supreme Court emphasized recently, "even if the BIA treats an alien's evidence as credible, the agency need not find his evidence persuasive or sufficient to meet the burden of proof."  *Garland v. Dai*, 141 S. Ct. 1669, 1680 (2021).

Finally, the BIA's statement that Martinez Rivera's father and siblings in Honduras might be able to assist with his relocation was not a misstatement of the record.  Contrary to Martinez Rivera's contention, the fact that his father has a heart condition and his brother is permanently disabled and confined to a wheelchair does not establish that his family would be unable to assist with his relocation.

**C.     Whether the BIA erred in determining that Martinez Rivera was not denied due process based on the IJ's alleged bias**

Martinez Rivera argues that his due process rights were violated by both the BIA and IJ.  He maintains that the IJ demonstrated clear bias at the hearing when he determined Martinez Rivera lacked good moral character based on pure speculation and information that came out at the merits hearing, which demonstrated favoritism to the government and antagonism toward him.  He further argues that the BIA "downplayed" his bias arguments, improperly "reframed" his claim as merely having insufficient time to prepare for his removal hearing, and applied the wrong standard of review.

Due process requires that the petitioner be given notice, an opportunity to be heard, and a full and fair hearing.  *Alhuay v. U.S. Att'y Gen.*, 661 F.3d 534, 548 (11th Cir. 2011).  In order to establish a due process violation, the petitioner "must show that [he] was deprived of liberty without due process of law and that the purported errors caused [him] substantial prejudice." *Id.* (quotation omitted).  But there is no liberty interest in receiving discretionary relief such as cancellation of removal. *See id.* at 548–49.  "We review constitutional challenges, including alleged due process violations, *de novo*." *Id.* at 548 (quotation omitted).

Although Martinez Rivera argues that the IJ's questioning demonstrated an antagonistic attitude towards him and favoritism toward the government, an IJ is permitted to play an active role in the hearing and to examine and cross-examine

17

witnesses. *See* 8 U.S.C. § 1229a(b)(1) (stating that the IJ shall receive evidence, and interrogate, examine, and cross-examine the petitioner and any witnesses). And in light of the documentary evidence, the IJ's questions and comments were directly related to the issue of good moral character, which is one of the required factors for cancellation of removal.[9]  Furthermore, because the BIA and the IJ did not rely on the good moral character factor when denying Martinez Rivera's application for cancellation of removal, Martinez Rivera did not suffer any prejudice from any alleged violation in the IJ's reasoning.

Moreover, even if some of the IJ's questions or comments were improper, Martinez Rivera has not shown that the IJ's actions at the hearing were so egregious as to deprive him of a full and fair hearing.  Rather, the record demonstrates that the IJ gave Martinez Rivera ample opportunity to testify, explain any discrepancies in the record or his history, and to present evidence on his behalf in support of his application.  Finally, contrary to Martinez Rivera's argument on appeal, a review of the record confirms that the BIA reviewed Martinez Rivera's bias claim *de novo* and not under the clearly erroneous standard.  Accordingly, Martinez Rivera failed to "show that [he] was deprived of liberty without due

---

[9]  To the extent that Martinez Rivera challenges the good moral character determination, we lack jurisdiction to review this factor because the BIA did not address this factor.  *See Martinez v. U.S. Att'y Gen.*, 446 F.3d 1219, 1221 n.2 (11th Cir. 2006) (explaining that when the BIA does not address an IJ's alternative holding, the alternative holding is not subject to review by this Court).

process of law and that the purported errors caused [him] substantial prejudice."

*Alhuay*, 661 F.3d at 548 (quotation omitted).

III.       Conclusion

In light of the foregoing reasons, we deny Martinez Rivera's petition for review.

**PETITION DENIED.**

MARTIN, Circuit Judge, concurring:

I write separately to note why I prefer not to use the term "alien," which the panel opinion uses ten times. Justice Kavanaugh has equated the term "noncitizen" with the statutory term "alien." Nasrallah v. Barr, 590 U.S. __, 140 S. Ct. 1683, 1689 n.2 (2020); see also United States v. Estrada, 969 F.3d 1245, 1253 n.3 (11th Cir. 2020). "Alien" is increasingly recognized as an "archaic and dehumanizing" term. Maria Sacchetti, ICE, CBP to Stop Using 'Illegal Alien' and 'Assimilation' Under New Biden Administration Order, Wash. Post (Apr. 19, 2021), https://www.washingtonpost.com/immigration/illegal-alien-assimilation/2021/04/19/9a2f878e-9ebc-11eb-b7a8-014b14aeb9e4_story.html.

To the extent the term "noncitizen" does not, in every instance, serve as a perfect replacement for the term "alien," that concern is not present in this case. I see no need to use a term that "has become pejorative" where a non-pejorative term works perfectly well. Library of Congress, Library of Congress to Cancel the Subject Heading "Illegal Aliens" at 1 (2016), https://www.loc.gov/catdir/cpso/illegal-aliens-decision.pdf.

BRANCH, Circuit Judge, concurring:

In her separate concurrence, Judge Martin takes issue with the fact that the majority uses the statutory term "alien," rather than her preferred term "noncitizen," ten times.[1]  However, each time the majority uses the term "alien"— in citing the statutory provision at issue, the holding of a court, or a court document, its use of the term is grounded in the text of the Immigration and Nationality Act ("INA").  As it is not our role to "fix" the text of the INA, we should not stray into legislative draftsmanship.  *See Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it."); *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009) ("Our function is to apply statutes . . . not to improve statutes by altering them." (quotation omitted)); *see Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 827 (1978) ("[A] statute is not an empty vessel into which this Court is free to pour a vintage that we think better suits present-day tastes." (quotation omitted)).  Further, if we were to substitute the term "alien" for "noncitizen" in reference to specific statutory provisions, we risk stating the law inaccurately.  As

---

[1] I recognize that, on occasion, the Supreme Court has used the term "noncitizen" rather than "alien" in its general discussion of our country's immigration laws.  For example, in *Barton v. Barr*, the Court noted that "[t]his opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'"  140 S. Ct. 1442, 1446 n.2 (2020).  But the Court in that same opinion nonetheless used the correct statutory term "alien" when quoting the INA.  *Id*. at 1446.  And subsequent Supreme Court  precedent has confirmed that the term "alien" remains appropriate. *See Garland v. Dai*, 141 S. Ct. 1669, 1680 (2021).

Justice Alito cautioned in his dissent in *Moncrieffe v. Holder*, "'[a]lien' is the term used in the relevant provisions of the [INA], and this term does not encompass all noncitizens." 569 U.S. 184, 210 n.1 (2013) (Alito, J., dissenting). For these reasons, I write separately.